ELTE, INC., Plaintiff-Appellee,

v.

S. S. MULLEN, INC., Defendant-Appellant.

No. 71–2572.

United States Court of Appeals, Ninth Circuit.

Nov. 8, 1972.

Rehearing Denied Dec. 11, 1972.

Phillip Offenbacker (argued), of Short, Cressman & Cable, Seattle, Wash., John G. Holden, of Wood, Wood, Tatum, Mosser & Brooke, Portland, Or., for defendant-appellant.

Norman B. Kobin (argued), Charles L. Kobin, Leo Levenson, of Kobin & Meyer, Portland, Or., for plaintiff-appellee.

Before: WRIGHT and CHOY, Circuit Judges, and TAYLOR,* District Judge.

FRED M. TAYLOR, District Judge:

The Appellee, Elte, Inc. (Elte), brought this diversity action against Appellant, S. S. Mullen, Inc. (Mullen), in the United States District Court for the District of Oregon, seeking compensation for work allegedly performed beyond the scope of its subcontract with Mullen and for damages as a result of alleged breaches of the contract by Mullen. Mullen counterclaimed seeking to recover from Elte the sum of $81,400.00 for work Mullen performed and which it claimed Elte was obligated to perform under the terms of the subcontract.

The case was tried before the court, without a jury, and judgment was thereafter entered awarding Elte the sum of $109,655.49, together with interest at the rate of six per cent per annum from September 1, 1968, and dismissing Mullen's counterclaim, from which judgment Mullen has appealed.

On March 31, 1967, Mullen entered into a contract with the United States, through the Corps of Engineers, to relocate approximately 12 miles of the Camas Prairie Railroad along the north bank of the Snake River in Whitman County, Washington, as a part of the

* The Honorable Fred M. Taylor, Senior United States District Judge, sitting by designation.

Little Goose Dam and Lock Project. The work in relocating the railroad right-of-way included grading, excavation, use of borrow materials, construction of embankments from materials excavated and obtained from borrow sources and the placement of a riprap protective blanket on the embankments.

The government, before bidding and after field exploration, designated two quarry sites known as the Hastings Hill Quarry and Stark Quarry as approved sources from which riprap materials could be taken, and also permitted the contractor to select its own sources. Riprap was defined in the specification as stone produced from bedrock which requires drilling and blasting for removal. The specification required that the riprap be placed at a certain time and in a specified manner during the construction.

Mullen was directed to proceed with its work on April 12, 1967. It experienced delay in obtaining a riprap subcontractor even though its schedules for the job required the placement of riprap by September 1, 1967. Sometime prior to November, 1967, Mullen had located a potential riprap source known as Smith Quarry at an advantageous location for the job. Prior to quoting a price and entering into the subcontract with Mullen, Mr. Forman, president and owner of Elte, visited and inspected the Smith Quarry site and also the Stark Quarry.

Originally, Mullen and Elte attempted to negotiate a contract involving the production, hauling and placing of the riprap. However, the parties could not agree on a price for all of this work and a written contract was negotiated limiting Elte's functions to drilling, shooting and processing the riprap, leaving quarry location, development, removal of overburden, hauling and placing of riprap with Mullen. The subcontract was executed on November 2, 1967.[1]

---

1. Pertinent provisions of the sub-contract: "Section I—SCOPE OF THE WORK. The labor and materials to be furnished and the work to be done by the Subcontractor are as follows:

Subcontractor will furnish all labor, equipment, materials and supplies to produce riprap for Bid Items 3 and 4 of the contract.

Contractor will provide quarry site and access roads.

Contractor will remove overburden to expose rock which cannot be ripped.

Contractor will furnish subcontractor with fuel and blasting powder at his cost.

Contractor will load and haul riprap from screening plant or from stockpile.

Contractor agrees to sell to the subcontractor a Vibrating MA7 screen, hopper, steel supports, motor base and motor for the lump sum amount of $14,000.00.

Subcontractor will furnish switch panel and generator.

Mobilization, erection and demobilization of the screening plant will be performed by the subcontractor.

Subcontractor will schedule his quarry operation to produce sufficient rock to allow the contractor to maintain his placing schedule.

It is anticipated that riprap will be required from more than one quarry site.

If in the course of excavation on the project an area is encountered that will apparently produce salvageable riprap rock, the contractor may request a proposal from the subcontractor to excavate and salvage riprap from those specific reaches.

Section II—PERFORMANCE OF WORK. The Subcontractor shall furnish all supervision, materials, supplies, and equipment, except as otherwise herein provided, and perform all labor required for the completion of the said work in accordance with all provisions of the original contract and of the specifications, plans and addenda referred to therein, all of which are hereby made a part of this agreement, and to the satisfaction of the owner and the Contractor.

Section III—COMPENSATION. The Contractor, for the full, complete and faithful performance of this subcontract, agrees to pay as full compensation:

\* \* \* \* \*

| Bid Item | Description | Estimated Quantity | Unit Price | Estimated Amount |
|---|---|---|---|---|
| 3 | Riprap, 200-lb. | 58,000 CY | $2.25 | $130,500.00 |
| 4 | Riprap, 400-lb. | 37,000 CY | 2.25 | 83,250.00 |
| | | | Total | $213,750.00 |

Elte commenced operations at the Smith Quarry on November 19, 1967. The Smith Quarry proved to be a disappointment due to the lack of available riprap. Despite the fact that the government had previously advised Mullen that success would be unlikely in this quarry, Mullen directed Elte to continue exploring and to open up other areas in the quarry site. Elte was instructed to record its costs for the exploration work and present them for payment. On January 28, 1968, Elte submitted a bill to Mullen for this work in the sum of $29,466.15. A supplemental billing was sent to Mullen on September 7, 1968 in the amount of $36,573.95.

On or about January 5, 1968, Elte was directed to move into the Stark Quarry where all of the riprap for the project was produced except for 3,700 cubic yards salvaged from Smith Quarry.

On this appeal, appellant does not challenge the trial court's findings of fact nor the necessity of applying the "clearly erroneous" rule. It is appellant's contention that the issues raised on this appeal involve only questions of law.

Mullen first contends that the allowance by the trial court of $29,000 as damages for the work done at the Smith Quarry was error. Elte claims that Mullen breached its subcontract because of Mullen's failure to provide Elte with a suitable quarry from which Elte could obtain and manufacture riprap. Mullen's defense to this claim is that the subcontract contains no warranty or representation concerning the quality or nature of material to be found in Smith Quarry. The trial court found:

"On the first quarry, [referring to the Smith Quarry] I find that the excessive expenses directly attributable to the abortive effort to exploit the nonproductive quarry were $29,000.00. I further find that this expense was caused by the defendant's unwarranted insistence upon trying to obtain rock where the government had previously advised the defendant that success would be unlikely."

Section 1 of the subcontract contains the following provisions:

"Contractor [Mullen] will provide quarry site and access roads."

"Contractor will remove overburden to expose rock which cannot be ripped."

It is clear that, pursuant to these two provisions of the subcontract, Mullen expressly undertook the obligation of locating suitable quarries and in removing all the overburden to expose rock which could not be ripped. Mullen was the one who chose the Smith Quarry and directed Elte to the site. Elte's ob-

---

All quantities are approximate. Actual payment will be made on quantities as measured for payment by the owner. Subcontractor's payment will be on rock placed after the October 1967 payment computed by the Owner.

It is anticipated that the contractor will require from 1200 to 1500 C.Y. of riprap per day.

\* \* \* \* \*

Section IV—COMPLETION. The Subcontractor shall, after notice to proceed by the Contractor, commence work at such points as the Contractor may designate and continue diligently in the performance thereof. The Subcontractor shall employ sufficient crews and work sufficient hours or shifts so as not to hinder or delay the actual progress of the Contractor or other subcontractors and in any event shall complete the several portions and whole of the work at such times as will enable the Contractor to fully comply with the terms of the original contract.

\* \* \* \* \*

Section VI—PAYMENT.

\* \* \* \* \*

The estimates and calculations made by the owner, or his engineers, as to the amount of work done by the Subcontractor shall be final and binding upon the parties hereto and shall conclusively establish the amount of work done by the Subcontractor. \* \* \*

Section VII—CHANGES, EXTRA WORK AND DISPUTES. It is understood and agreed that the Contractor is not an insurer or guarantor of the work or any part thereof; of the performance by the owner of the original contract; or of the plans and specifications furnished by the owner."

\* \* \* \* \*

ligation under the subcontract did not begin until a suitable quarry site containing riprap was selected by Mullen. The crux of the agreement between these parties was the obtaining of suitable riprap in a reasonably economical manner from a quarry selected by Mullen. To interpret this contract as not requiring Mullen to provide a quarry where riprap could be produced would render the entire contract meaningless. In Purvis v. United States, 344 F.2d 867, 870 (9th Cir. 1965), this court stated, inter alia, that writings should be interpreted and applied so that they may have effect rather than be destroyed. This court subscribes to the principle that where one interpretation makes a contract unreasonable or such that a prudent person would not normally contract under such circumstances, but another interpretation equally consistent with the language would make it reasonable, fair and just, the latter interpretation would apply. See Stender v. Twin City Foods, Inc., 5 Wash.App. 809, 490 P.2d 1311, 1315 (1971).

Mullen also argues that the admission in evidence of the negotiations preceding the execution of the subcontract was error. We disagree. A trial court is entitled to ascertain what the intention of the parties was at the time of contracting, and evidence of the character of the subject matter, the nature of the business, antecedent offers and counteroffers, and the communications of the parties with each other in the process of negotiation is admissible for such purpose. Seaver v. United States Plywood Corporation, 273 F.2d 36, 41 (9th Cir. 1959). The evidence was not offered and admitted for the purpose of varying or altering the terms of the written contract and did not do so. The court found that Mullen was obligated under the provisions of the contract to provide Elte with suitable quarry sites and we agree.

Lastly, in connection with the Smith Quarry claim, appellant contends that an improper measure of damages

was applied since Elte only presented evidence of its total costs of operation and made no showing of circumstances making it possible for the trial court to assess damages with reasonable certainty. There is no merit to this contention. The record reveals that the trial court substantially reduced Elte's demand from $36,573.95 to $29,000.00, finding this to be the expense caused by Mullen's "unwarranted insistence upon trying to obtain rock where the government had previously advised the defendant that success would be unlikely". The following rationale, stated in Brear v. Klinker Sand & Gravel Company, 60 Wash.2d 443, 374 P.2d 370, 374 (1962), supports the above finding of the trial court:

"If the fact of damage is established, the rule applicable to the ascertainment of the amount of damages takes effect. That rule is stated in Dunseath v. Hallauer, 41 Wash.2d 895, 902, 253 P.2d 408, 413 (1953):

" 'The difficulty of ascertainment of the amount of damage is not to be confused with the right of recovery. [citation omitted] The rule is that, if the plaintiff has produced the best evidence available and if it is sufficient to afford a reasonable basis for estimating his loss, he is not to be denied a substantial recovery because the amount of the damage is incapable of exact ascertainment.' "

We are also of the opinion that the ruling in Continental Casualty Co. v. Schaefer, 173 F.2d 5 (9th Cir.), cert. denied 337 U.S. 940, 69 S.Ct. 1517, 93 L. Ed. 1745 (1949), concerning the admissibility of the "total cost approach", after the court had found a breach of contract on the part of the prime contractor, is controlling and is reaffirmed.

The second contention raised by Mullen in this court is that the allowance of $24,405.49 as damages for acceleration costs incurred at the Stark Quarry was incorrect since the subcontractor assumed the risks of overtime and other acceleration costs. The falla-

cy of appellant's argument is twofold. First, the trial court specifically found that the accelerated effort in the Stark Quarry was incurred because of Mullen's failure to initially provide a suitable quarry. Once the breach of contract is determined, Elte is entitled to all damages proximately resulting from said breach. Second, the record reveals that Mullen had expressly told Elte to record its additional costs and bill Mullen. This was done with no payment having been made by Mullen.[2] Although not involving a breach of contract issue, the holding in Baker & Ford Co. v. United States, 363 F.2d 605, 607 (9th Cir. 1966), that a subcontractor is entitled to compensation for costs incurred on account of necessary accelerated work performance in addition to the compensation agreed upon in the subcontract, applies equally to this fact situation.

■ Appellant's third contention is that the allowance of $56,250.00 as payment for an additional 25,000 cubic yards of riprap can only be sustained if the government's determination of quantity was arbitrary and capricious. It is Mullen's position that the compensation and payment sections of the subcontract completely control the quantity of riprap for which Elte was to be paid. (See Footnote 1) It is shown by the evidence that Elte produced a large amount of riprap for which it was never paid. Elte claims that Mullen, due to the pressure of time, deviated from the prime contract by dumping riprap down the embankments from heights contrary to the specifications in the prime contract; and that riprap was being used as fill material to cover underbuilt portions of the railroad embankment in lieu of regular fill materials, thus causing Elte to produce quantities in excess of the quantity found by the government under the neat-line method (in place volume) as specified in the prime contract. Mullen argues that under its contract with Elte it was only obligated to pay Elte for the same amount of riprap accepted in place and for which it (Mullen) was paid by the government. The only riprap considered by the government was that placed within the designated fill areas and any riprap used outside of these areas was not included in the government's determination of the quantity of riprap for which it would pay Mullen. Elte offered proof tending to show that as much as 90,000 cubic yards of riprap was wasted by Mullen.

Furthermore, the record reveals that Mullen presented a claim to the government admitting that 25,000 cubic yards of riprap was wasted. The government acknowledged waste but refused payment to Mullen finding, in part, that the waste was occasioned by Mullen's inefficient placement of riprap contrary to specifications in the prime contract. The trial court found that the evidence was in sharp conflict on this claim and concluded that:

"25,000 cubic yards of riprap was wasted by the defendant in excess of any volume that reasonably could have been within the contemplation of the parties at the time of their contract."

■ To accept Mullen's argument that Elte assumes the risk of Mullen's failure to perform in accordance with the specifications and doing its work in an unworkmanlike manner places Elte in the position of a "subservient contractor" rather than a subcontractor. Implicit in the contract entered into between the parties was the understanding that each party would perform its obligations in such a way as not to impede

2. The original contract entered into by Mullen and the government totaled $3,-949,631 based on approximate quantities. The amount paid to Mullen after completion was $7,259,999.57. Approximately $2,101,287 of this amount resulted from settlements of various claims made on or about February 5, 1969. Included in this settlement figure was the sum of $495,110.00 as a lump sum settlement for Mullen's intensified work effort. The settlement of these accelerated work claims was accomplished only after the withdrawal of Elte's portion of the acceleration claim in order to effect the settlement.

the progress or increase the cost of the other. When a contractor deviates from his contractual responsibilities and causes a subcontractor to be damaged, the law permits recovery. Northeast Clackamas C.E. Co-op v. Continental Cas. Co., 221 F.2d 329 (9th Cir. 1955); Continental Casualty Co., *supra*. It is not reasonable to believe that Elte, by entering into the subcontract with Mullen whereby it was agreed that the subcontract would be performed in accordance with the plans and specifications contained in the prime contract, was thereby agreeing to be bound by the contracting officer's decision with respect to matters or disputes arising between the contractor and the subcontractor. Ace Construction Company v. W. H. Nichols & Company, 353 F.2d 110, 113 (10th Cir. 1965). It is obvious that the contracting officer for the government recognized the above as being correct since he advised Mullen, in his opinion concerning Mullen's claim for additional compensation, that: "I as Contracting Officer, would not attempt to decide those issues existing between prime and subcontractors."

Appellant's fourth contention is that the allowance by the trial court of pre-judgment interest was erroneous. On August 2, 1971, the trial judge amended the original judgment of July 15, 1971, *nunc pro tunc*, so as to allow pre-judgment interest of six percent per annum on the entire recovery of $109,655.49 from September 1, 1968. This allowance of interest amounts to an additional sum of $18,915.00.

■ In the State of Washington and elsewhere, prejudgment interest is allowable (1) when an amount claimed is liquidated or (2) when the amount claimed in unliquidated and this amount is determinable by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion. See Mall Tool Co. v. Far West Equipment Co., 45 Wash.2d 158, 273 P.2d 652, (1954).

Both parties cite *Mall Tool Co., supra,* as authority on this interest question. Mullen cites it for the proposition that when evidence on issues in dispute involve a high degree of expert opinion and judgment as to reasonableness of the various factors, these factors cannot be determined by mathematical computations from standards fixed in the subcontract and thus are not subject to an award of pre-judgment interest. Elte urges that the awards given by the trial court were either liquidated, thus placing them within category one above, or were unliquidated, with the amount determinable without reliance on opinion or discretion, placing them in category two.

■ An analysis of each of the awards made by the trial court reveals the following:

(1) In awarding $29,000.00 as damages for the work done at the Smith Quarry, the trial court found and this court agrees that Mullen had the responsibility of providing a suitable quarry and had expressly told Elte to bill it for its work in that quarry. Once the trial court found a breach of the subcontract or an obligation to pay for the work on the part of Mullen, the determination of the amount of damages was ascertainable from the evidence presented without reliance on opinion or discretion.

(2) The allowance of $24,405.49 as damages for acceleration costs at the Stark Quarry was the exact amount as billed by Elte, which billing was requested by Mullen. The quantum of this claim was acknowledged by Mullen but it did dispute the same solely on the basis of entitlement. When a dispute arises between the parties as to entitlement, the claim is still one for liquidated damages and should bear pre-judgment interest. See Prier v. Refrigeration Engineering Company, 74 Wash.2d 25, 442 P.2d 621 (1968).

(3) In regard to the allowance of $56,250.00 as payment for the additional 25,000 cubic yards of riprap, Mullen contends that Elte can only recover pre-

judgment interest on this amount if the government's determination of quantity was arbitrary and capricious. Mullen acknowledged the quantum of this claim to the extent of the trial court's award. We have heretofore held in this opinion that the contract between the government and Mullen is not controlling as to quantities of riprap placed outside the neatlines. The total dollar amount arrived at by the trial court was readily ascertainable by the application of the contract unit price ($2.25 per cubic yard) and Elte is therefore entitled to pre-judgment interest on this amount.

 Mullen's final contention is that the trial court erred in denying it relief on its counterclaim. The trial court dismissed appellant's counterclaim "for lack of evidence to support it." After carefully examining the record, we agree with the trial court.

The judgment made and entered in this cause is affirmed.