Herbert S. ZIM, Plaintiff-Appellant,

v.

WESTERN PUBLISHING COMPANY,
Defendant-Appellee.

No. 75–3776.

United States Court of Appeals,
Fifth Circuit.

June 2, 1978.

John C. Malloy, Robert J. Van Der Wall, Miami, Fla., for plaintiff-appellant.

Garth A. Webster, Miami, Fla., David E. Beckwith, Robert A. DuPuy, Milwaukee, Wis., for defendant-appellee.

Before GOLDBERG, AINSWORTH, and FAY, Circuit Judges.

GOLDBERG, Circuit Judge:

I

*In the beginning, Zim*[1] *created the concept of the Golden Guides.*[2] For the earth was dark and ignorance filled the void. And Zim said, let there be enlightenment and there was enlightenment. In the Golden Guides, Zim created the heavens (STARS) (SKY OBSERVER'S GUIDE) and the earth. (MINERALS) (ROCKS and MINERALS) (GEOLOGY).[3]

And together with his publisher, Western, he brought forth in the Golden Guides knowledge of all manner of living things that spring from the earth, grass, herbs yielding seed, fruit-trees yielding fruits af-

---

1. Dr. Zim is a noted science educator with a Ph.D. in science education from Columbia University. His special expertise is in the presentation of scientific subjects to popular audiences. The major focus of his efforts has been the development of a multivolume series of books on scientific subjects, the "Golden Guides." Dr. Zim, the plaintiff in this suit, is a citizen of the state of Florida. The defendant, Western Publishing Co. is a Wisconsin corporation which does not have its principal place of business in Florida. Since the amount in controversy is in excess of $10,000, diversity jurisdiction exists under 28 U.S.C. § 1332.

2. The listing of titles in the following account is neither exhaustive nor chronologically accurate.

3. Zim's actual role in the preparation of the books in the Golden Guide series varied from book to book. Zim was the principal author of some of the books; other books were prepared jointly by Zim and an expert in the particular field. The expert supplied the technical knowledge which Zim assembled and presented in a form suitable for lay readers.

ter their kind, (PLANT KINGDOM) (NON–FLOWERED PLANTS) (FLOWERS) (ORCHIDS) (TREES), and Zim saw that it was good. And they brought forth in the Golden Guides knowledge of all the living moving creatures that dwell in the waters, (FISHES) (MARINE MOLLUSKS) (POND LIFE), and fowl that may fly above the earth. (BIRDS) (BIRDS OF NORTH AMERICA) (GAMEBIRDS). And Zim saw that it was good. And they brought forth knowledge in the Golden Guides of the creatures that dwell on dry land, cattle, and creeping things, (INSECTS) (INSECT PESTS) (SPIDERS), and beasts of the earth after their kind. (ANIMAL KINGDOM). And Zim saw that it was very good.[4]

## II

*Then there rose up in Western a new Vice-President who knew not Zim.* And there was strife and discord, anger and frustration, between them for the Golden Guides were not being published or revised in their appointed seasons. And it came to pass that Zim and Western covenanted a new covenant, calling it a Settlement Agreement. But there was no peace in the land. Verily, they came with their counselors of law into the district court for judgment and sued there upon their covenants.

And they put upon the district judge hard tasks. And the district judge listened to long testimony and received hundreds of exhibits. So Zim did cry unto the district judge that he might remember the promises of the Settlement Agreement. And the district judge heard Zim's cry, but gave judgment for Western. Yea, the district judge gave judgment to Western on a counterclaim as well. Therefore, Zim went up out of the court of the district judge.

## III

*And Zim spake unto the Court of Appeals saying, make a sacrifice of the judgment below.* And the judges, three in number, convened in orderly fashion to recount the story of the covenants and to discuss and answer the four questions which Zim brought before them.[5]

In the first count of his complaint, Zim sought an accounting for royalties due him under the 1970 Settlement Agreement and other agreements. During the course of the trial, most of the issues pertaining to this count were settled when the parties agreed to share the cost of an audit of royalties. The scope of the audit, however, depends in part on the interpretation of certain provisions of the Settlement Agreement. Zim wished to offer parol evidence relevant to these provisions, but was foreclosed from doing so by the district court's ruling that the testimony was inadmissible under the Wisconsin parol evidence rule. Zim challenges this ruling on appeal. The second question before us arises out of Zim's allegation that Western breached the Settlement Agreement by publishing revised versions of two of the Golden Guides, STARS and SKY OBSERVER'S GUIDE, without obtaining his prior approval. The district judge rejected Zim's contention, finding that Western had submitted all proposed changes to Zim, but that Zim had unreasonably withheld his approval.[6] Zim's third contention on appeal is that the district judge failed to make appropriate findings relevant to Zim's third count, a tort claim for the unauthorized use of Zim's name in the revised publications. Finally, Zim attacks the district court's judgment in

---

4. According to Zim's brief before this court, well over 100 million of the Golden Guide books have been printed under Zim's name, earning him "millions of dollars" in royalties.

5. The trial below was long and involved a host of exceedingly complex issues. The district judge's rulings on most of the difficult questions presented for resolution below have not been appealed. We restrict ourselves to discussion of those rulings challenged on appeal and note that we have been materially aided in our consideration of these issues by the district court's careful memorandum opinion and his skill, displayed at many points in the trial, in encouraging counsel to focus questions on specific issues before the court.

6. The second count also alleged a variety of other contractual defaults. None of these is before us on appeal.

favor of Western on its counterclaim for unjust enrichment.

## IV

### A. Parol Evidence

*And the parties came before the district judge for an accounting of the royalties of Zim.* Under Sections 3 and 4 of the 1970 Settlement Agreement, Zim was entitled to payments of royalties and bonuses for books in the "Golden Guide Series."[7] Subsection 1.1 of the 1970 contract defines "Golden Guides":

> Subsection 1.1—"Golden Guides," or "Guides," as used herein means: All books published or to be published or distributed by Western in the *Golden Guide* series (including Golden Nature Guides, Golden Handbooks, Golden Science Guides, Golden Regional Guides and Golden Field Guides) or any subseries thereof, regardless of size, binding, format or content, including any publication of similar concept and/or purpose, under the same or a different name.

The parties agree that Zim is to earn royalties and bonuses only on those books "published or to be published or distributed by Western. . . ." They disagree sharply, however, on the correct construction of "Western." Zim offered parol evidence, the testimony of the attorney who represented him during the contract negotiations, to support his view that "Western" means not only Western Publishing Co., the defendant here, but its affiliates and subsidiaries as well. The district judge excluded the testimony on the grounds that "Western" was unambiguous as a matter of law in view of the first recital in the contract. There the parties to the contract were stated to be Zim and "Western Publishing Co., Inc. (a Wisconsin Corporation),

its successors and assigns, herein referred to as 'Western' . . . ." In the district court's view, the contract provided its own definition of "Western" and that definition was not itself subject to ambiguity, i. e., Western Publishing Co., Inc. (a Wisconsin Corporation), its successors and assigns, meant that jural entity and none other. Zim contends that this ruling denies him his "day in court" and is inconsistent with the Wisconsin parol evidence rule.[8]

The Supreme Court of Wisconsin has repeatedly formulated and reformulated the parol evidence rule. See, e. g., *F. D. I. C. v. First Mortgage Investors,* 76 Wis.2d 151, 250 N.W.2d 362 (1977); *Patti v. Western Machine Co.,* 72 Wis.2d 348, 241 N.W.2d 158 (1976); *Marshall & Isley Bank v. Milwaukee Gear Co.,* 62 Wis.2d 768, 216 N.W.2d 1 (1974); *Conrad Milwaukee v. Wasilewski,* 30 Wis.2d 481, 141 N.W.2d 240 (1966); *Georgiades v. Glickman,* 272 Wis. 257, 75 N.W.2d 573 (1956). Notwithstanding all the effort in this area, confident application of the rule to a particular case remains elusive. It is, therefore, with some trepidation that we embark upon this determination.

■ The law in Wisconsin appears to be that parol evidence is not admissible to contradict or vary the terms of an agreement, but may be considered in interpreting an ambiguous term. See, e. g., *F. D. I. C. v. First Mortgage Investors, supra,* 250 N.W.2d at 365, *Marshall & Isley Bank v. Milwaukee Gear Co., supra,* 216 N.W.2d at 5.[9] In *Patti, supra,* the court set out an approach to parol evidence problems which is instructive.

> The ultimate aim of all contract interpretation is to ascertain the intent of the parties. If this intent can be determined with reasonable certainty from the face of the contract itself, there is no need to

---

7. These royalties and bonuses were to be paid in addition to regular royalties due Zim under individual book contracts executed for the vast majority of the Guides. This "superroyalty" arrangement resulted from the desire of the parties to put their relationship on a new basis.

8. Applying the Florida conflicts of law rule, the district judge held that the Wisconsin parol

evidence rule governed the question before us. Neither party challenges that ruling on appeal.

9. The most recent full-dress opinion on the parol evidence rule in Wisconsin contains some language noting criticism of the "vary or contradict" articulation, but does not discard it. *F. D. I. C. v. First Mortgage Investors, supra,* 250 N.W.2d at 307 n. 12.

resort to extrinsic evidence. If, however, the language of the contract is ambiguous, then the court is not restricted to the face of the instrument in ascertaining intent, but may consider extrinsic evidence. Words or phrases in a contract are ambiguous when they are reasonably susceptible of more than one meaning.

241 N.W.2d at 160.

■ In another attempt to render unambiguous the meaning of "ambiguous", the Wisconsin Supreme Court has said,

A word or term in a contract to be ambiguous must have some stretch in it—some capacity to connote more than one meaning—before parol evidence is admissible.

*Conrad Milwaukee Corp. v. Wasilewski, supra,* 141 N.W.2d at 244.[10] Moreover, although Wisconsin law recognizes that parol testimony is admissible to clarify a "latent ambiguity," even here the "parol testimony is admitted to resolve an existing ambiguity, not to create one." *Marshall & Isley Bank v. Milwaukee Gear Co., supra,* 216 N.W.2d at 6.

In the case at bar, the parties made an effort in the written instrument to define the term whose meaning they now contest. They defined "Golden Guides" by reference to another term, "Western," the meaning of which the agreement also provides explicitly. "Western," the recitals tell us, is to stand for "Western Publishing Co., Inc., (A Wisconsin Corporation) its successors and assigns." Western Publishing Co., Inc. (a Wisconsin Corporation), is a definite entity, created by the law and legally distinct from separately incorporated affiliates or subsidiaries. Indeed, when the parties intended to make reference to corporate entities related to, but legally distinct from, Western Publishing Co., Inc. they were capable of specifying this meaning with precision. Subsection 1.2 provides:

"Individual Contract," as used herein means: A contract between Western (*including Western's predecessors in interest*) and Zim . . . ..

Emphasis added.

■ Here, then, counseled parties made a deliberate effort to define a crucial term in the agreement. They defined that term in words with a quite definite legal significance. When they wished to give that term some special meaning different from its definition in the agreement, they so provided in unmistakable terms. We think the district court was correct in its conclusion that the intent of the parties was unambiguously evidenced by the writing itself. Under Wisconsin law, the parol evidence was properly excluded.

### B. *The Contract Claims*

Zim next contends that Western breached the 1970 Settlement Agreement by publishing revised versions of two of the Golden Guides, STARS and SKY OBSERVER'S GUIDE, without his approval. Zim bases his claim on Subsection 6.5 of the contract.

*Subsection 6.5*—Zim releases to Western all Zim's right, interest and claim under all programs heretofore agreed upon or now under way for the revision of books published prior to the date hereof. It is agreed, however, that Western will not publish any revision, change, correction, alteration or updating of any book published prior to October 1, 1970 on which Zim is entitled to a royalty or bonus, without Zim's prior approval.

It is undisputed that both STARS and SKY OBSERVER'S GUIDE had been published prior to October 1, 1970. It is also undisputed that projects for the revision of both books were "under way" when the contract was executed. It is also undisputed that Western failed to obtain Zim's approval of the revisions prior to publication

---

**10.** In that case, the court rejected an attempt to show by parol evidence that the date "June 1" in an option to buy an apartment actually meant three months from the date of occupancy by the tenant. The court found June 1 to be unambiguous as a matter of law even though the defendant/tenant was able to show that his lease agreement called for an occupancy date of March 1, i. e., three months prior to June 1, and the apartment was not actually ready for occupancy until mid-May.

of the revised versions of the books. Zim vigorously contends that these facts establish a breach of contract by Western and that he was entitled to damages and an injunction against further publication without his approval.

Western counters by pointing out that the district judge found that Western had submitted all proposed changes to Zim for his approval, but that Zim "unreasonably withheld" his approval of the changes. Western contends that Zim's failure to make a meaningful response to the proposed changes excuses Western's publication of the revisions.

The evidence demonstrates that subsection 6.5 reflects a careful balancing and accommodation of the interests of Western and Zim. Because relations between the parties had not been productive in the years immediately preceding the 1970 Settlement Agreement, both sides wanted to put the relationship on a new basis. Western, identifying Zim as the cause of delays in the publication or revision of many of the Golden Guides, wanted to limit Zim's role in the series. Zim, too, wished to retire from his extremely active role in the preparation of the Guides. However, Zim had a profound interest, both professional and financial, in maintaining the quality of the Guides, particularly those already published under his name. Therefore, while Zim released all rights under revision programs then under way, Zim obtained Western's pledge not to publish any revisions of books published prior to October 1, 1970 without Zim's prior approval. Zim's power to prohibit publication of the revised versions of books published prior to October 1, 1970, under subsection 6.5 must be distinguished from his power under subsection 6.4 of the contract which deals with books not yet published. As to these, Zim could only determine whether and in what capacity his name would be shown on the book.

Zim's power of approval under subsection 6.5 cannot, however, be construed to be an unlimited power to prevent publication of revised versions of the Guides covered by 6.5. Zim bargained for the retention of his power to exercise his judgment as a science educator with enormous experience in the presentation of material in the Golden Guides format. That judgment, once exercised, was to be decisive; Western could not publish revisions of which Zim disapproved. Nonetheless, justice and fairness considered in the light of the parties interests here require that Zim's power not extend to holding Western hostage to dilatoriness, obstructionism, or greed. *See George v. Oswald,* 273 Wis. 380, 78 N.W.2d 763 (1956); *James v. Gulf Life Ins. Co.,* 66 So.2d 62 (Fla.1953) (construction of contract giving one party unfair or unreasonable advantage over the other is to be avoided); *Bouden v. Walker,* 266 So.2d 353 (Fla.App. 1972).[11] Zim's retained power to disapprove changes, therefore, has to be exercised within a reasonable time and in a reasonable manner, i. e., in a manner which makes it possible for Western to rework the manuscript in order to obtain his approval. Necessarily, this requires reasonable specificity in the statement of Zim's objections to any proposed changes. *Commercial Contractors Inc. v. U. S. Fidelity and Guaranty Co.,* 524 F.2d 944 (5th Cir. 1974) (implied condition of cooperation and good faith between contracting parties); *Elte Inc. v. S. S. Mullen Inc.,* 469 F.2d 1127 (9th Cir. 1972) (implied understanding that each party would perform its obligations in way not to impede or hinder progress or increase cost of other); *Casale v. Carrigan and Boland, Inc.,* 288 So.2d 299 (Fla.App.1974) (implied promise to give cooperation). To read the contract without such an implied limitation would be to read it as a grant of power to Zim to destroy the fruits of the agreement for Western, a construction resisted by the courts. *See e. g., Sessions Inc. v. Morton,* 491 F.2d 854 (9th Cir. 1974); *Gulf Am. Land*

---

11. There does not appear to be any difference between the approach taken by the Wisconsin and Florida courts to the contract interpretation question at issue in this case. Hence, we need not address ourselves to the question of whether Florida or Wisconsin law governs the particular question in dispute here, the scope of Zim's power of disapproval.

*Corp. v. Wain,* 166 So.2d 763 (Fla.App.1964); *George v. Oswald, supra.*

The testimony and exhibits concerning the revision of SKY OBSERVER'S GUIDE show that Western sent Zim proposed changes in June of 1971. After working on the material for some time, Zim requested more legible copies of certain portions. Further correspondence ensued after the new material was sent to Zim. Western made several entreaties for a definite answer either approving or disapproving the changes. Zim responded in August of 1971 in a letter in which he set out six conditions on the grant of approval, including the demand that Western conclude a contract with him to do a major revision of the book. Zim's letter did not contain any specific objections to particular revisions. Western answered that Zim had no right to make such demands and once again requested Zim's approval of the changes. An additional six weeks passed without any response from Zim, at which point an immediate answer was demanded. No answer was forthcoming and Western proceeded to publish the revised version of SKY OBSERVER'S GUIDE.

█ Under these circumstances, we have no hesitation in concluding that Zim failed to exercise his power of disapproval within the time and in the manner required, and in so doing effectively waived his right to reject the proposed revisions. Zim's approval conditioned on execution of a new contract was an abusive use of his power and an attempt to reform the Settlement Agreement. This is not to say that Zim

was not honestly motivated by a desire to maintain and improve the quality of SKY OBSERVER'S GUIDE. It is to say, however, that conditioning his approval in this manner was beyond the scope of his contractual power.[12] Zim's failure to exercise his power properly operated to authorize Western's publication of the revised work. The district court's holding as to SKY OBSERVER'S GUIDE must be affirmed.

The situation with STARS is quite different. Although proposed revisions were sent to Zim in 1972, a final set of revisions was first sent to Zim in September of 1974.[13] Western at that time demanded that Zim examine the revisions and report within sixty days his approval or disapproval together with suggested changes. Western stated that it would consider his suggestions and advise him whether the changes would be made. Western stated it would then ask Zim whether he wished to be shown as co-author, original project editor, or have his name removed entirely from the book. Western proceeded to publish the book notwithstanding Zim's express disapproval communicated within the sixty day period.

█ It is apparent that Western breached the agreement here. Western's 1974 letter confused Zim's rights under subsections 6.4 and 6.5 of the agreement. Zim's prior approval of the revised version of STARS was a prerequisite to lawful publication by Western, absent waiver by Zim. Since there had been no waiver as to STARS,[14] Western's publication of the book

12. If, for example, the work had not been changed sufficiently to justify calling it a "revised edition" in Zim's view, he had the power to condition his approval on deletion of that appellation. This he did not do. Instead, he attempted to use his power to compel Western to hire him to do the revisions he considered necessary.

13. Between 1972 and 1974, the project for the revision of STARS was in suspended animation. Apparently, the revision project was discussed during negotiations looking toward a settlement of this suit. However, no final resolution was reached at that time.

14. Zim's waiver as to SKY OBSERVER'S GUIDE was not a waiver of Zim's rights with respect to every subsequent book covered by subsection 6.5. Zim's waiver with respect to SKY OBSERVER'S GUIDE occurred three years prior to the final submission of the STARS revision to him. Until the September 1974 letter from Western, Zim had never been informed that Western intended to treat the earlier waiver as a waiver of Zim's rights with respect to other books. Zim's retained power to prevent publication of revised versions of the Guides covered by subsection 6.5 was at the very heart of the bargain struck by the parties in structuring their new relationship. We hesitate to construe the scope of a waiver so broadly that it demolishes one of the pillars

without Zim's approval constituted a breach of contract.

■■■■ The district court found, however, that Zim did not prove any damages from the publications of STARS. This finding is not clearly erroneous. Under Florida law,[15] nominal damages, however, are recoverable upon a finding of breach of contract even though no proof of further damages is made out. *Hutchison v. Tompkins,* 259 So.2d 129, 132 (Fla.1972) (overruling grant of motion to dismiss complaint). *See generally* 11 Williston on Contracts § 1339A (3d ed. 1968). Although an appellate court will ordinarily not reverse because of a failure to award nominal damages, where costs have been awarded against the appellant, reversal is required. *Id.* The district court here awarded costs to Western as the prevailing party below. Since we must remand this case to permit the district court to reconsider that award in view of the outcome of this appeal, a remand for the determination of nominal damages is also appropriate. *See Three-Seventy Leasing Corp. v. Ampex Corp.,* 528 F.2d 993, 998–99 (5th Cir. 1976).[16] Moreover, Zim prayed for injunctive relief restraining Western from publishing revisions of additional books covered by 6.5 without honoring Zim's right of approval. In view of its conclusion that Zim had not established any breach of the agreement, the district court did not specifically address the propriety of injunctive relief under traditional equitable standards. Since that question should be resolved in the first instance by the district court, we remand for

a determination on that question as well. We leave to the sound discretion of the district judge the question whether any further evidence is necessary on the question of injunctive relief.[17]

## C. *The Tort Claims*

The third count of Dr. Zim's complaint alleged an unauthorized and wrongful appropriation of Zim's name, a claim sounding in tort under Florida law.[18] Zim's claim again grows out of the publication of revised revisions of STARS and SKY OBSERVER'S GUIDE. Zim's name appeared on the spine of both books even though he never approved the revisions. Moreover, Zim's initials appeared beneath a foreword added to STARS which expressed his gratitude to the authors hired by Western to revise the book. Zim never approved this foreword either.

■■■■ Florida was one of the pioneering jurisdictions in recognizing a "right of privacy" under common law. *See Cason v. Baskin,* 155 Fla. 198, 20 So.2d 243 (1944). In that case a woman named and depicted without her consent in a short story sued the well-known author, Marjorie Kinnan Rawlings. The Florida Supreme Court, in a broadly philosophical opinion, held that a cause of action for invasion of privacy existed and announced general principles governing and delimiting that action. While the particular fact situation in *Cason* primarily implicated that subspecies of the right of privacy which Prosser has denomi-

---

of the contractual relationship established by the Settlement Agreement. *Cf.* 3A Corbin on Contracts § 754 (even repeated waivers, such as progress payments made prior to the performance of conditioning requiring payment, will not in themselves create waivers of later conditions).

**15.** Florida law governs this question in view of the Florida conflicts rule, which the district court sitting in Florida was bound to apply, *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 61 S.Ct. 1020, 85 L.Ed. 1477 (1941), that questions of remedies for breach of contract are governed by the law of the forum. *See Goodman v. Olsen,* 305 So.2d 753 (Fla.1974); *Wingold v. Horowitz,* 292 So.2d 585 (Fla.1974).

**16.** We do not intend to preclude the district court from ordering each party to bear its own costs if that result commends itself to the court's discretion.

**17.** Of course, in view of our conclusions on the breach of contract issues, that portion of the district court's order which appears to excuse Western *in·futuro* from any obligation to submit revisions to Zim cannot stand.

**18.** The parties stipulated that Florida law governs the tort claim here.

nated "public disclosure of private facts," W. Prosser, *supra,* at 809–10, the *Cason* opinion has sprouted shoots of other varietals as well. *Santiesban v. Goodyear Tire and Rubber Co.,* 306 F.2d 9 (5th Cir. 1962) (undue harassment of debtor); *Thompson v. City of Jacksonville, Fla.,* 130 So.2d 105 (Fla.App.1961) (physical intrusion). The right involved in the case at bar is Zim's right to control the use of his name for commercial purposes; appropriation of Zim's name by Western for its own use would be tortious under the law of most states. *See Motschenbacher v. R. J. Reynolds Tobacco Co.,* 498 F.2d 821 (9th Cir. 1974) (reviewing cases); W. Prosser, *supra,* at 804–07. Indeed, this was the first form of the right of privacy to be recognized by the courts. *Id.* at 804. Although we have found no Florida case directly on point, we do not doubt that the Florida courts would recognize such a cause of action. Indeed, as we said in *Santiesban, supra,* where we faced a similar problem of ascertaining the scope of the right to privacy under Florida law, the "Florida authorities demonstrate that the right of privacy is recognized in Florida as it is in an overwhelming number of jurisdictions in this country." *Santiesban v. Goodyear Tire and Rubber Co., supra,* 306 F.2d at 11. Thus, Zim's complaint alleged a cause of action with respect to the use of his name in SKY OBSERVER'S GUIDE and STARS. We have already concluded, however, that Western was entitled under the contract to publish SKY OBSERVER'S GUIDE without Zim's actual approval in view of Zim's default. Western's right under the contract to publish the book in these circumstances operates as an authorization sufficient to privilege Western's use of Zim's name as a matter of tort law as well. W. Prosser, *supra,* at 817 (citing cases). *Cf. Gilham v. Burlington Northern, Inc.,* 514 F.2d 660 (9th Cir. 1975) (scope of consent); *Manger v. Kree Institute of Electrolysis, Inc.,* 233 F.2d 5 (2d Cir. 1956) (same); *Kimbrough v. Coca-Cola/USA,* 521 S.W.2d 719 (Tex.Civ.App. 1975) (same).

▮▮▮ Just the opposite result obtains with respect to STARS. Paradoxically, if repeatedly in this case, he who observes the skies does not see the STARS. Western's use of Zim's name in STARS was unauthorized by the contract and was, therefore, tortious. Although Zim failed to prove any actual damages from the publication of the revised version of STARS, under Florida law, nominal damages, at least are recoverable; the plaintiff need not plead or prove actual damages. *Cason v. Baskin, supra,* 20 So.2d at 247, 252.[19] We must, therefore, reverse the district court and remand for an award of nominal damages.[20]

---

**19.** In the context of a claim for misappropriation of one's name, proof of monetary loss is not a prerequisite to the recovery of damages. *See* W. Prosser, *supra,* at 815. Upon proper proof, the plaintiff is entitled to compensation for the deprivation of his right to control the use of a commercially valuable asset, his name. Obviously, the "rental value" of a particular author's name is not susceptible of proof with mathematical exactitude. Nonetheless, credible evidence such as expert testimony of literary agents or others with similar experience in the field, must be brought forward if the plaintiff is to recover more than nominal damages. The only testimony going to the question of damages was Zim's own statement as to the amount he had been damaged by the publication of STARS. That statement, self-serving and conclusory in character, made no attempt to segregate the particular value attached to the use of Zim's name. Under these circumstances, district judge's finding that Zim proved no actual damages, even as understood in this context, is not clearly erroneous.

**20.** Punitive damages are not recoverable in this case in view of the district court's conclusion that any breach of Western's obligations to Zim "was not as a matter of law done in a willful or wanton manner or with utter disregard of plaintiff's rights." Under Florida law a tort committed by mistake in bona fide assertion of a supposed right will not warrant allowance of exemplary or punitive damages in the absence of malicious motive, recklessness or gross negligence. *Winn and Lorett Grocery Co. v. Archer,* 126 Fla. 308, 171 So. 214 (1937); *Griffith v. Shamrock Village, Inc.,* 94 So.2d 854 (Fla.1957) (malice, moral turpitude, wantonness or outrageousness of tort). Here, the circumstances make apparent the fact that Western confused two provisions of the Settlement Agreement, 6.4 and 6.5, or acted in the belief that Zim's prior conduct excused Western from its obligation to obtain Zim's approval to revisions. The district court's conclusion that Western's breach was not willful or wanton is not clearly erroneous.

## D. *Western's Counterclaim*

Section 6 of the 1970 Settlement Agreement contains a series of releases by Zim in favor of Western. In subsection 6.6, Western promised to pay Zim the total sum of $67,200 "as consideration for the several releases stated in subsections 6.1 through 6.5". In subsection 6.4 Zim released to Western all rights under a 1968 agreement to control the content or give final approval to the publication of twenty hitherto unpublished books. Zim was to earn royalties on these books, two of which Western agreed to publish each calendar year "subject only to compelling economic reasons preventing such performance." "As further consideration for the payment promised by Western in Subsection 6.6," i. e. the $67,200, Zim agreed that Western would "be deemed to have credit for advances to Zim in the amount of $3,750 against royalties to be earned on each of fifteen of the books listed above in this subsection 6.4, and advances in the amount of $1,000 against each of five of the books listed above in this subsection 6.4."

This rather complex set of reciprocal promises forms the structure of Western's counterclaim against Zim. After paying Zim the full $67,200, Western decided not to publish three of the books listed in subsection 6.4, claiming "compelling economic reasons," a claim which the district judge found supported by the evidence and which Zim does not now contest. In its counterclaim, Western sought recovery of $11,250, an amount equal to thrice $3,750, on an unjust enrichment theory. The court below granted judgment for Western on this claim.

We must reverse. Western's counterclaim is premised on an erroneous construction of the relevant provisions of the contract. As we read subsection 6.6, Western made an unconditional, undivided promise to pay $67,200 for the set of releases executed by Zim in subsections 6.1–6.5. Western's obligation to pay this sum was in no way conditioned on publication of all twenty books listed in subsection 6.4. However, Western did bargain for and obtain an opportunity to reduce its total monetary obligation to Zim by crediting payment for the release against royalties to be earned by Zim upon publication of the books. Western would not be obligated to Zim for the first $3750 of royalties earned on the publication of each of fifteen books or the first $1000 of royalties on each of five books.

The complex provisions of subsection 6.4 simultaneously provide an opportunity for Western to recoup most of its $67,200 payment and an incentive for Western to publish and effectively promote the sales of all twenty volumes.[21] The provision thus encourages Western to publish all the books, an outcome manifestly in Zim's interest.[22] In short, Western gambled on reducing the effective cost of the releases in subsections 6.1–6.5 by reducing its total liability to Zim for royalties on published books.[23]

The fact that Western decided not to publish three of the books means only that Western's gamble will not pay off as handsomely as it might have. The cost of obtaining the releases will not be reduced

---

21. By placing a $3750 limit on the maximum credit against royalties on each of fifteen volumes and a $1000 maximum on the remaining five, the provision discourages Western from relaxing its efforts after successful publication of one or a few volumes; only if all twenty are published may the maximum credit of $61,250 (15 times $3750 plus 5 times $1000) be realized.

22. Absent the incentive provided by the credit scheme, Western would be disinclined to publish any books with little promise, at least so long as a colorable claim of "compelling economic circumstances" could be made out. Since Zim shared in the possibility of a return on a book through royalties without incurring a downside risk, publication of every book was in Zim's interest.

23. In the best of all possible worlds for Western, Zim would earn at least $3,750 of royalties on each of the fifteen books to which that figure applied and at least $1,000 of royalties on each of the five books to which that figure applied. In such a world, the actual cost to Western of obtaining all the releases in subsections 6.1–6.5 would have been reduced to $5,950.

by the theoretical maximum. That is no warrant, however, for reducing the absolute obligation to pay Zim $67,200 as promised in subsection 6.6.

V

*And when the judges of the Court of Appeals had passed through the wilderness of Zim, they recapitulated the history of their journey.*

The ruling of the district judge regarding parol evidence on the meaning of "Western" is AFFIRMED. The court's conclusion that Western did not breach the Settlement Agreement or commit a tort by publishing the revised version of SKY OBSERVER'S GUIDE is also AFFIRMED. We REVERSE, however, the court's conclusion that Western committed no breach of the contract by publishing the revised version of STARS. We REMAND for a determination and award of nominal damages for the breach of contract, for a determination of the propriety of injunctive relief against future breaches, for a determination and award of nominal damages to Zim for the tort committed by Western by using Zim's name on STARS without his authorization, and for reconsideration of the award of costs against Zim. We REVERSE the judgment for Western on its counterclaim. And it therefore shall come to pass that the district judge shall write another chapter in the chronicle of Zim.

AFFIRMED IN PART, REVERSED IN PART AND REMANDED.