March 30, 1993
UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 92-1139

MARGRET REY,

Plaintiff, Appellee,

v.

RICHARD G.D. LAFFERTY, ET AL.,

Defendants, Appellants.

No. 92-1177

MARGRET REY,

Plaintiff, Appellant,

v.

RICHARD G.D. LAFFERTY, ET AL.,

Defendants, Appellees.

APPEALS FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Rya W. Zobel, U.S. District Judge]

Before

Selya, Cyr and Boudin,

Circuit Judges.

H. Joseph Hameline with whom Andrea M. Fish and Mintz, Levin,

Cohn, Ferris, Glovsky & Popeo, PC were on brief for appellee Rey.

Charles Donelan with whom Katherine E. Perrelli, Kristen G.

McGurn and Day, Berry & Howard were on brief for appellants Lafferty,

et al.

March 30, 1993

CYR, Circuit Judge. Margret Rey, who owns the copy-
CYR, Circuit Judge.

right to the "Curious George" children's books, challenges an

award of damages to Lafferty Harwood & Partners ("LHP") for Rey's

withholding of approval of various ancillary products utilizing

the "Curious George" character under their 1983 licensing agree-

ment. LHP appeals the district court order awarding Rey damages

and future royalties on certain other "Curious George" products.

We affirm in part and reverse in part.

I

BACKGROUND

"Curious George" is an imaginary monkey whose antics

are chronicled in seven books, written by Margret and H.A. Rey,

which have entertained readers since the 1940s. A mischievous

personality consistently lands Curious George in amusing scrapes

and predicaments. The more recent "monkey business" leading

to the present litigation began in 1977 when Margret Rey

granted Milktrain Productions an option to produce and televise

104 animated "Curious George" film episodes. The option agree-

ment was contingent on Milktrain's obtaining financing for the

film project, and adverted to a potential agreement to license

"ancillary products," based on the "Curious George" character,

once the 104 film episodes had been completed.

3

A. The Original Film Agreements.

Milktrain approached LHP, a Canadian investment firm,

to obtain financing for the project. LHP agreed to fund the

venture by selling shares in the project to investors (hereinaf-

ter: the "Milktrain Agreement"); LHP and its investors were to

divide a 50% share of Milktrain's profits on the films and on any

future ancillary products.

With the financing commitment in place, Rey granted

Milktrain and LHP a limited license "to produce (within a two-

year period from the date of exercise) one hundred and four (104)

four minute film episodes based on the ["Curious George"] charac-

ter solely for broadcast on television" (hereinafter: the "Rey

License"). Rey was to receive a fee for assisting with the

editing and production of the episodes, and an additional royalty

amounting to 10% of the revenues from any film telecasts. The

Rey License made no mention of ancillary product rights. Never-

theless, LHP promoted the project to investors through a prospec-

tus (hereinafter: the "1978 Private Placement Memorandum") which

represented, inter alia, that "the production contract [with Rey]

gives LHP the right to participate in the financing of . . . the

option . . . to undertake the exploitation of other rights to

'Curious George' including manufacturing, food, licensing and

other commercial areas of exploitation."

B. The Revised Agreements.

The film project soon encountered delays and financial

setbacks. By early 1979, though only 32 of the 104 episodes had

4

been completed, the original investment funds had been virtually

exhausted. In order to rescue the project and complete the films

to Rey's satisfaction, LHP offered to arrange additional financ-

ing. In consideration, LHP insisted that the Milktrain Agreement

be revised to permit LHP to assume control of the film production

process and to receive higher royalties on the completed epi-

sodes. Milktrain assented to these revisions, and the revised

Milktrain Agreement (hereinafter: the "Revised Milktrain Agree-

ment" or "RMA") was signed on November 5, 1979.

As prelude to its description of the new obligations

between Milktrain and LHP, the RMA recited that Milktrain and LHP

owned "the rights to Curious George which have been obtained from

. . . Rey" under the Rey License. The RMA further stated that:

Investors acquiring the episodes shall ac-
quire all right, title and interest therein,
without limitation or reserve, including the
original negative . . . .

LHP shall have the right to participate on an
equal basis with [Milktrain] in their right
of first refusal after the present agency
rights expire to undertake the exploitation
of other rights to Curious George, including
manufacturing, food, licensing and the publi-
cation of the 104 episodes in book form . . .
in accordance with the rights granted to
[Milktrain] and LHP [by Rey] in [the Revised
Rey License].1

Simultaneously with the negotiation of the RMA, LHP

proposed several changes in the Rey License, including language

1Shortly thereafter, Milktrain apparently assigned its share
of ancillary product licensing rights to LHP, leaving LHP the
sole owner of these rights.

5

which would have granted LHP the immediate right to "undertake

the exploitation of other rights to 'Curious George,' including

manufacturing, food, licensing and the publication of the 104

episodes in book form." Rey rejected the LHP proposal in a

letter to Richard G. D. Lafferty (president and C.E.O. of LHP):

"I have repeatedly stated to Milktrain and to you that I will not

consider negotiating such rights before the films are done." Rey

did consent, however, to certain changes to the royalty arrange-

ments, whereby Rey would receive a 10% share of film revenues

only "after the investors have recouped [their investment] and

certain soft dollar commitments . . . have been paid."

On November 5, 1979, concurrently with the execution of

the Revised Milktrain Agreement, a revised version of the Rey

License (hereinafter: the "Revised Rey License" or "RRL") was

executed, incorporating these changes, and superseding the

original Rey License. The RRL recited that the original Rey

License had granted Milktrain and LHP the right to produce and

distribute animated "Curious George" films "for television view-

ing," but made no mention of the "ancillary product" rights

unsuccessfully sought by LHP.

As agreed, LHP undertook to arrange further financing

to complete the film project. On November 23, 1979, LHP released

another prospectus (hereinafter: the "1979 Private Placement

Memorandum") to which it attached the Revised Milktrain Agree-

ment. The 1979 Private Placement Memorandum again stressed the

prospect of eventual revenues from ancillary products but noted

6

that these rights "have yet to be negotiated" with Rey.

C. The Ancillary Products Agreement.

Production of the 104 TV episodes was completed in

1982. On January 3, 1983, an Ancillary Products Agreement (or

"APA") was signed by Rey and LHP, granting LHP a general right to

license "Curious George" in spin-off ("ancillary") products for a

renewable term of five years. The APA defined "ancillary prod-

ucts" as:

All tangible goods . . . excluding books,
films, tapes, records, or video productions
. . . . However, for stories already owned by
[LHP] and which have been produced as 104
episodes under the license granted in the
January, 1978 agreement and the November 5,
1979 revision of that agreement, [LHP] shall
have the right to produce books, films,
tapes, records and video productions of these
episodes under this Agreement, subject to
[Rey's] prior approval . . . which prior
approval shall not be unreasonably withheld.

In return for these rights, Rey was to receive one-third of the

royalties on the licensed products, with certain minimum annual

payments guaranteed. Rey retained the right to disapprove any

product, and to propose changes which would make a disapproved

product acceptable to her. The APA provided, inter alia, that

Rey's approval would not be withheld "unreasonably."

D. The Houghton Mifflin Contract.

Following the execution of the Ancillary Products

Agreement, LHP assigned its licensing rights to a new subsidiary,

Curgeo Enterprises, which turned its attention to licensing the

7

"Curious George" character in various product forms.2 On

March 27, 1984, Curgeo executed a contract with Houghton Mifflin

Company to publish the 104 television film episodes in the form

of a children's book series. The contract provided that Houghton

Mifflin would publish at least four books, with illustrations

drawn directly from the film negatives, in each year from 1984

through 1987; the contract was renewable for an additional five-

year term if LHP and Rey agreed to extend the APA beyond 1987.

Pursuant to the contract, Houghton Mifflin published four books

each year from 1984 through 1987.

In 1987, LHP notified Houghton Mifflin that it had

declined to extend the APA, but that Curgeo had "entered into a

new operating agreement which permits us to continue to act in

the capacity in which we have been acting for the last five

years. . . . [Y]ou are free to pick up your option to renew." In

response, Houghton Mifflin extended its contract for the addi-

tional five-year term, publishing an additional four books in

1988 and again in 1989. It ceased publication of the book series

in 1990, when Rey advised that the APA had been cancelled.

E. Other Product Licenses.

Curgeo moved aggressively to license the "Curious

George" character in other product areas as well. Beginning in

1983, the "Curious George" TV episodes were licensed to Sony

2Curgeo Enterprises is not named in the Rey complaint;
Curgeo Agencies Inc. and Curgeo Overseas, Inc., are named as
defendants. We refer to the three entities collectively as
"Curgeo."

8

Corporation, which transferred the images from the television

film negatives to videotape. LHP takes the position that the

Sony video license was entered pursuant to the RRL; Rey claims it

is subject to the APA. See supra at pp. 6-7.

In 1983, Curgeo licensed "Curious George" to Eden Toys

Inc., which proposed to market a "Curious George" plush toy. In

the beginning, Rey rejected Eden's proposed designs for the toy,

but Eden eventually proposed several versions which were accept-

able to Rey. The plush toy was marketed from 1983 to 1990, but

experienced poor sales and generated less revenue than expected.

Eden blamed the poor market performance on Rey's alterations to

Eden's original design proposals.

In 1987, Curgeo received a commitment from Sears,

Roebuck to market "Curious George" pajamas through the Sears

catalog. The Sears pajama project promised high returns, but

catalog deadlines necessitated immediate approval of a product

design. Glen Konkle, Curgeo's agent, brought Rey a prototype

pajama and a flat paper sketch of "Curious George" which had been

proposed as the basis for the final pattern. Rey rejected the

proposal, complaining that the pajama material was "hard, ugly

[and] bright yellow," and that the sketch of "Curious George" was

"plump" and "not recognizable." The catalog deadline passed and

the pajama manufacturers withdrew their bids. In addition, Beach

Paper Products, which had orally agreed to license "Curious

George" for a line of paper novelties, withdrew its offer after

learning that "Curious George" products would not receive expo-

9

sure in the Sears catalog.

In 1988, Curgeo licensed "Curious George" to DLM Inc.,

which intended to use the "Curious George" character in a trilogy

of educational software. Rey approved the software in principle,

and production began in July 1988. In August 1988, however, DLM

withdrew its plans to complete the "trilogy" after Rey telephoned

DLM's project director and harshly criticized the design of the

first software product and the accompanying manual developed by

DLM.

F. The Ancillary Products Agreement Renewal.

Due in part to these product rejections, LHP earned

less money than it anticipated from ancillary products. When the

APA came up for renewal in January 1988, LHP declined to exercise

its option for an additional five-year term. Instead, the

parties agreed to renew on a month-to-month basis, terminable by

either party on one month's notice. Rey's royalty rate was

increased to 50% (effective January 3, 1988), but with no guaran-

teed minimum payment. On April 10, 1989, Rey terminated the APA.

LHP responded by advising that Curgeo would "continue to adminis-

ter those licenses which [remained] outstanding and report to you

from time to time accordingly." LHP thereupon continued to

market the Sony videos and to publish the television films in

book form under the Houghton Mifflin agreements.

G. "Curious George" Goes to Court.

On February 8, 1991, Rey filed suit against Lafferty,

10

Curgeo and LHP, in connection with LHP's continuing, allegedly

unauthorized production of the Houghton Mifflin books and Sony

videos. Rey's complaint alleged violations of federal copyright,

trademark and unfair-competition statutes, breach of contract,

and violations of Mass. Gen. L. ch. 93A ("chapter 93A"); it

sought to enjoin further violations and to recover unpaid royal-

ties on the books and videos. LHP countersued, claiming that Rey

unreasonably had withheld approval of various products while the

APA remained in force. The LHP complaint alleged breach of

contract, interference with contractual and advantageous business

relationships, and violation of chapter 93A.

After a four-day bench trial, the district court found

for Rey on her claims for breach of contract, ruling that the

book and video licenses were governed by the APA and that Rey was

entitled to recover $256,327 in royalties. The court found for

LHP on several LHP counterclaims, however, holding that Rey

unreasonably had withheld approval of, inter alia, the Sears

pajamas, the DLM software, and Eden's original plush toy design.

LHP was awarded $317,000, representing lost profits and conse-

quential damages resulting from Rey's rejection of these prod-

ucts.

II

DISCUSSION

"Under Massachusetts law, the 'interpretation of a

contract is ordinarily a question of law for the court'."

11

Fairfield 274-278 Clarendon Trust v. Dwek, 970 F.2d 990, 993 (1st

Cir. 1992) (quoting Edmonds v. United States, 642 F.2d 877, 881

(1st Cir. 1981)); see also, e.g., Lawrence-Lynch Corp. v. Depart-

ment of Environmental Mgmt., 392 Mass. 681, 682, 467 N.E. 2d 838,

840 (1984); Sparks v. Microwave Associates, Inc., 359 Mass. 597,

600, 270 N.E. 2d 909, 911 (1971).3 Only if the contract is am-

biguous will there arise issues of fact reviewable for clear

error. See Dwek, 970 F.2d at 993; see also ITT Corp. v. LTX

Corp., 926 F.2d 1258 (1st Cir. 1991); Fashion House, Inc. v. K

Mart Corp., 892 F.2d 1076, 1083 (1st Cir. 1989) (New York law).

"Contract language is usually considered ambiguous where an

agreement's terms are inconsistent on their face or where the

phraseology can support reasonable difference of opinion as to

the meaning of the words employed and obligations undertaken," K

Mart, 892 F.2d at 1083 (citing In re Navigation Technology Corp.,

880 F.2d 1491, 1495 (1st Cir. 1989)). The ambiguity determina-

3The Rey License and RRL contain choice-of-law provisions
providing for the application of New York law, and the Milktrain
Agreement and RMA contain choice-of-law provisions providing for
the application of the law of the Province of Quebec, Canada.
Neither party alludes to these contractual provisions in their
briefs, however, and both parties appear to have premised their
trial presentations and appellate briefs on the application of
Massachusetts law. In accordance with their choice, and since a
"reasonable relation" exists between their contract and the
Massachusetts forum, see Carey v. Bahama Cruise Lines, 864 F.2d

201, 206 (1st Cir. 1988), we apply Massachusetts law. See Borden

v. Paul Revere Life Ins. Co., 935 F.2d 370, 375 (1st Cir. 1991)

("[w]here . . . the parties have agreed about what law governs, a
federal court sitting in diversity is free, if it chooses, to
forego independent analysis and accept the parties' agreement");
accord Doherty v. Doherty Ins. Agency, Inc., 878 F.2d 546, 547

(1st Cir. 1989); Moores v. Greenberg, 834 F.2d 1105, 1107 n.2

(1st Cir. 1987).

12

tion itself is subject to plenary review, id., and parol evidence

may not be used to "create ambiguity where none otherwise ex-

ists." See Boston Car Co. v. Acura Auto. Div., 971 F.2d 811, 815

(1st Cir. 1992) (citing ITT Corp., 926 F.2d at 1261).

A. The Book/Video Claims.

The Rey complaint alleged that LHP's only right to

publish the "Curious George" TV episodes in book and video form

derived from the Ancillary Products Agreement, was subject to the

APA's royalty provisions, and expired when Rey terminated the APA

in 1989. LHP responds that the book and video rights to the TV

episodes were governed by the parties' other agreements, specifi-

cally the Revised Rey License, which (according to LHP) incor-

porated the Revised Milktrain Agreement. According to LHP, these

other agreements continued in effect notwithstanding termination

of the APA; moreover, these agreements provided that no royalties

were due Rey before LHP's investors recovered their investment in

the 104 TV films.4 The district court accepted the interpreta-

tion urged by Rey, based on the language of the various contracts

and the circumstances surrounding their execution. We agree.

1. The Houghton Mifflin Books.

The Ancillary Products Agreement provided, inter alia,

that

for stories already owned by [LHP] . . .
which have been produced as 104 episodes

4LHP contends that $250,000 (U.S.) had yet to be recovered
by the investors at the time the present action was commenced.

13

under the license granted in the January,
1978 agreement and the November 5, 1979 revi-
sion of that agreement, [LHP] shall have the
right to produce books, films, tapes, records

and video productions of these episodes under

this Agreement, subject to [Rey's] prior

approval . . .

(Emphasis added.) Throughout the document the term "this Agree-

ment," utilizing the capital letter "A", refers to the APA.

Thus, the plain language of the operative provision clearly con-

templates that the APA was to govern the licensing of any books

and "video productions" arising from the 104 films. See Barilaro

v. Consolidated Rail Corp., 876 F.2d 260, 265 n.10 (1st Cir.

1989) ("it is . . . 'a general rule in the construction of a

written instrument that the same word occurring more than once is

to be given the same meaning unless a different meaning is

demanded by the context.'") (quoting Dana v. Wildey Sav. Bank,

294 Mass. 462, 466, 2 N.E.2d 450, 453 (1936)).

LHP argues, nonetheless, that a narrow meaning must be

ascribed to the quoted APA language, insofar as the RMA purported

to grant investors "all right, title and interest [to the 104

film episodes], without limitation or reserve, including the

original negative." The problem with LHP's argument is that Rey

never signed the RMA. LHP concedes this, but argues that the RMA

and RRL were negotiated and executed simultaneously by LHP, and

must be interpreted in pari materia. See, e.g., Interstate

Commerce Comm'n v. Holmes, slip op. at 10-11 (1st Cir. Jan. 11,

1993) (escrow agreement and consent decree read together, as

"synergistic" documents); accord Chelsea Indus., Inc. v. Flor-

14

ence, 358 Mass. 50, 55-56, 260 N.E.2d 732 (1970); Thomas v.

Christensen, 12 Mass. App. Ct. 169, 422 N.E.2d 472, 476 (1981).

The Massachusetts courts sometimes have held that the party to be

bound need not have signed each component part of an integrated

agreement where it is the "sense" of the transaction, as support-

ed by reliable indicia in the writings which were signed by the

party to be bound, that a unitary transaction was contemplated by

the parties. See Chase Commercial Corp. v. Owen, 32 Mass. App.

Ct. 248, 588 N.E.2d 705 (1992) (holding that non-signatory

guarantor was bound by jury trial waiver contained in loan and

security agreements, though guarantee agreement contained no such

waiver, where "the three documents were part of one transac-

tion"); see also Gilmore v. Century Bank & Trust Co., 20 Mass.

App. Ct. 49, 50, 477 N.E.2d 1069, 1073 (1985) (holding that non-

signatory trustee could recover for breach of workout agreement,

even though not a party to its terms, based on "sense" of agree-

ment, and "such factors as simultaneity of execution, identity of

subject matter and parties, cross-referencing, and interdepen-

dency of provisions"). On this theory, LHP contends, Rey's

signature on the RRL bound her to the language of the RMA, and

authorized LHP to transfer the television episodes to book form,

using available technology.

However, where contract language contains no unambigu-

ous indicia of the parties' mutual intent to enter into a unitary

transaction, we review for "clear error" the fact-dominant deter-

mination whether their separate documents were intended by the

15

parties as an integrated agreement. Interstate Commerce Comm'n

v. Holmes, slip op. at 10-11; Holmes Realty Trust v. Granite City

Storage Co., 25 Mass. App. Ct. 272, 517 N.E.2d 502, 504 (1988)

("it would be open to a fact finder . . . to treat [separate

documents] as intended by the parties to be parts of a single

transaction") (emphasis added); Fred S. James & Co. v. Hoffmann,

24 Mass. App. Ct. 160, 163, 507 N.E.2d 269, 271 (1987).

In the present case, we find no "clear error" in the

district court's determination that the parties contemplated

separate (though related) transactions for film rights and

financing. The evidence cut both ways. On the one hand, the RMA

and the RRL were executed at approximately the same time, with

some overlap in their internal references and subject matter. On

the other hand, their respective provisions are less in unison

than parallel.5 Most importantly, the written and circumstan-

tial indicia sharply contradict any suggestion of a meeting of

the minds relating to the licensing of ancillary products. Rey

did not participate in negotiating the RMA, did not sign it, was

5Even if the RMA and RRL were jointly construed, their
language might point away from the interpretation urged by LHP.
Section 2(i) of the RMA granted LHP's investors "all right, title
and interest" in the 104 T.V. episodes, "without limitation or
reserve," but 1(a) tempered this grant by defining the rights
as "described herein, and set forth in Schedule 'A' [the RRL]."
This language suggests that the "right, title, and interest"
language of the RMA was meant only to confirm and restate, and

not to expand upon, the RRL's parallel, but more limited, grant
of rights. Cf. Fred S. James & Co., 24 Mass. App. Ct. at 164,

507 N.E.2d at 272 (finding no conflict between simultaneously
executed instruments, where their language and the extrinsic
evidence suggested independent obligations arising from simulta-
neous contracts).

16

never made a party to its terms, and expressly refused, during

the RRL negotiations, to license "Curious George" for the "ancil-

lary" purposes now urged by LHP. See supra at p. 6. Moreover,

the 1979 Private Placement Memorandum prepared by LHP acknowledg-

es Rey's nonacceptance by attaching the RRL as an exhibit and

noting that ancillary product rights "have yet to be negotiated"

with Rey. Finally, the parties' intention to exclude the Hough-

ton Mifflin books from the RRL, and their intention to cover them

in the APA, are corroborated by their subsequent course of

dealing: among other things, the record shows that LHP paid Rey

royalties on the books and videos on several occasions at the 33%

rate required under the APA, rather than the 10% rate prescribed

by the RRL, and that Curgeo expressly keyed the dates of the

Houghton Mifflin contract to the term (and anticipated renewal

term) of the Ancillary Products Agreement:

By September 30, 1987, Curgeo [will] inform
[Houghton Mifflin] in writing as to whether
Curgeo has exercised its option to exploit
the character "Curious George" through
December 31, 1993 and, if Curgeo has exer-
cised said option, Curgeo shall give the
Publisher the option to extend this Agreement
through December 31, 1993.

It was for the district court to balance the evidence

in the first instance, see Holmes Realty Trust, 517 N.E. 2d at

504, and we discern no sound reason to disagree with its find-

ings, particularly on "clear error" review. See Interstate

Commerce Comm'n v. Holmes, slip op. at 13 (citing Cumpiano v.

Banco Santander Puerto Rico, 902 F.2d 148, 152 (1st Cir. 1990))

17

(even if proffered interpretation did "[give] rise . . . to

another plausible view of the evidence," reversal not warranted

on "clear error" review).6

To sum up: Since the district court supportably found

that the RRL and the RMA are separate, though related, agree-

ments, the RMA's purported grant of rights did not bind Rey, who

was bound only by the grant of rights she endorsed in the RRL and

APA. The RRL contained no grant of rights to produce the Hough-

ton Mifflin books, and the APA, which granted the right "to

produce books . . . of these episodes," obligated LHP to pay Rey

royalties on the books without regard to whether LHP's investors

had recouped their investment on the television film project.

Thus, the district court did not err in finding that LHP's

withholding of the Houghton Mifflin book royalties was wrongful,

and we affirm its ruling on this point.

6We reject LHP's further contention that Rey's failure to
protest publication of the four Houghton Mifflin books in 1990
estops her from cancelling the book and video contracts under the
APA. Where more than one inference fairly may be drawn from the
evidence and an estoppel ruling turns on an issue of fact, we
review for clear error. United States v. Marin, 651 F.2d 24, 29

(1st Cir. 1981); Morgan Guaranty Trust Co. v. Third Nat'l Bank,

529 F.2d 1141, 1144 (1st Cir. 1976). In our view, Rey's conduct
does not require an inference that she acquiesced in the publica-
tion of these books under the APA. Rather, Rey protested the
publication of the four books by filing suit shortly after
realizing the unauthorized nature of Houghton Mifflin's continued
publication. The district court apparently found that Rey's one-
year delay, dating from the first unauthorized publication until
the filing of Rey's suit for injunctive relief, was not "unrea-
sonable" in the circumstances, and we decline to disturb its
findings on this issue.

18

2. The Sony Videos.

LHP's claim to the Sony video royalties is more compli-

cated: assuming the videos were not covered by the contractual

clause in the RMA, see supra Part II.A.1., might they nonetheless

have been covered by the grant of rights in the RRL, which

licensed LHP to produce the 104 episodes "for television view-

ing"? The district court thought not: the parties' "reference

to television viewing . . . in a licensing agreement . . . does

not include [video technology] . . . which probably was not in

existence at the time that the rights were given."

a. "New Uses" and Copyright Law.

For purposes of the present appeal, we accept the

uncontested district court finding that the relevant video

technology "was not in existence at the time that the rights"

were granted under the RRL in January 1979. Consequently, it

must be inferred that the parties did not specifically contem-

plate television "viewing" of the "Curious George" films in

videocassette form at the time the RRL was signed. Such absence

of specific intent typifies cases which address "new uses" of

licensed materials, i.e., novel technological developments which

generate unforeseen applications for a previously licensed work.

See Melville B. Nimmer and David Nimmer, 3 Nimmer on Copyright

10.10[B] at 10-85 (1992) ("Nimmer") ("the . . . fact that we

are most often dealing with a later developed technological

process (even if it were known in some form at the time of

execution) suggests that the parties' ambiguous phraseology masks

19

an absence of intent rather than a hidden intent which the court

simply must 'find'").

Normally, in such situations, the courts have sought at

the outset to identify any indicia of a mutual general intent to

apportion rights to "new uses," insofar as such general intent

can be discerned from the language of the license, the surround-

ing circumstances, and trade usage. See, e.g., Murphy v. Warner

Bros. Pictures, Inc., 112 F.2d 746, 748 (9th Cir. 1940) (grant of

"complete and entire" motion picture rights to licensed work held

to encompass later-developed sound motion picture technology);

Filmvideo Releasing Corp. v. Hastings, 446 F. Supp. 725 (S.D.N.Y.

1978) (author's explicit retention of "all" television rights to

licensed work, in grant of motion picture rights predating tech-

nological advances permitting movies to be shown on television,

included retention of right to show motion picture on televi-

sion). Where no reliable indicia of general intent are discern-

ible, however, courts have resorted to one of several interpre-

tive methods to resolve the issue on policy grounds.

Under the "preferred" method, see 3 Nimmer at 10-85,

recently cited with approval in SAPC, Inc. v. Lotus Development

Corp., 921 F.2d 360, 363 (1st Cir. 1990), the court will con-

clude, absent contrary indicia of the parties' intent, that "the

licensee may properly pursue any uses which may reasonably be

said to fall within the medium as described in the license." 3

Nimmer at 10-86. Under this interpretive method, the courts will

presume that at least the possibility of nonspecific "new uses"

20

was foreseeable by the contracting parties at the time the

licensing agreement was drafted; accordingly, the burden and risk

of drafting licenses whose language anticipates the possibility

of any particular "new use" are apportioned equally between

licensor and licensee. See, e.g., Bartsch v. Metro-Goldwyn-

Mayer, Inc., 391 F.2d 150, 155 (2d Cir.), cert. denied, 393 U.S.

826 (1968) ("[i]f the words [of the license] are broad enough to

cover the new use, . . . the burden of framing and negotiating an

exception should fall on the grantor" of the licensed rights).

An alternative interpretive method is to assume that

a license of rights in a given medium (e.g.,

'motion picture rights') includes only such
uses as fall within the unambiguous core
meaning of the term . . . and excludes any
uses which lie within the ambiguous penumbra
(e.g., exhibition of motion picture film on

television). Thus any rights not expressly
(in this case meaning unambiguously) granted
are reserved.

See 3 Nimmer at 10-85; see also Bourne Co. v. Walt Disney Co.,

1992 Copyr. L. Rep. (CCH) 26,934 (S.D.N.Y. 1992) ("if the

disputed use was not invented when the parties signed their

agreement, that use is not permitted under the contract"). This

method is intended to prevent licensees from "'reap[ing] the

entire windfall' associated with the new medium," Cohen v.

Paramount Pictures Corp., 845 F.2d 851, 854 (9th Cir. 1988)

(quoting Neil S. Nagano, Comment, Past Software Licenses and the

New Video Software Medium, 29 U.C.L.A. L. Rev. 1160, 1184 (-

1982)), and is particularly appropriate in situations which

21

involve overreaching or exploitation of unequal bargaining power

by a licensee in negotiating the contract. See, e.g., Bartsch,

391 F.2d at 154 & n.2 (citing Ettore v. Philco Television Broad-

casting Corp., 229 F.2d 481 (3d Cir. 1955) (suggesting narrow

construction where licensor was not "an experienced businessman"

and had no "reason to know of the . . . potential" for new uses

at the time he signed the relevant agreement)). It may also be

appropriate where a particular "new use" was completely unfore-

seeable and therefore could not possibly have formed part of the

bargain between the parties at the time of the original grant.

Cohen, 845 F.2d at 854; Kirke La Shelle Co. v. Paul Armstrong

Co., 263 N.Y. 79, 188 N.E. 163 (1933). Obviously, this method

may be less appropriate in arm's-length transactions between

sophisticated parties involving foreseeable technological devel-

opments; in such situations, narrow construction of license

grants may afford an unjustifiable windfall to the licensor, who

would retain blanket rights to analogous "new uses" of copyright

material notwithstanding the breadth of the bargained-for grant.

See generally 3 Nimmer at 10-85 ("it is surely more arbitrary and

unjust to put the onus on the licensee by holding that he should

have obtained a further clarification of a meaning which was

already present than it is to hold that the licensor should have

negated a meaning which the licensee might then or thereafter

rely upon.").7

7The problem becomes particularly acute when the analogous
technology develops so rapidly as to supplant the originally
contemplated application of the licensed work, rendering the

22

b. Video Technology as "New Use".

These fine-tuned interpretive methods have led to

divergent results in cases considering the extension of televi-

sion rights to new video forms. Thus, for example, in Rooney v.

Columbia Pictures Industries, Inc., 538 F. Supp. 211 (S.D.N.Y.),

aff'd, 714 F.2d 117 (2d Cir. 1982), cert. denied, 460 U.S. 1084

(1983), the court determined that a series of contracts granting

motion picture distributors a general license to exhibit plain-

tiffs' films "by any present or future methods or means" and "by

any means now known or unknown" fairly encompassed the right to

distribute the films by means of later-developed video technol-

ogy.

The contracts in question gave defendants
extremely broad rights in the distribution
and exhibition of pre-1960 films, plainly

intending that such rights would be without

limitation unless otherwise specified and
further indicating that future technological
advances in methods of reproduction, trans-
mission and exhibition would inure to the
benefit of defendants.

(Emphasis added.) Similarly, in Platinum Record Co. v.

Lucasfilm, Ltd., 566 F. Supp. 226, 227 (D. N.J. 1983), the court

parties' original bargain obsolete. Thus, for example, broad
grants of "motion picture rights," made before technological
advances permitted the combination of moving images with sound,

later were held, typically, to encompass the rights to sound
motion picture technology; a narrower holding would have left the
original license virtually worthless, despite its broad language,
and would have provided the licensor with an undeserved windfall.
See, e.g., Murphy, 112 F.2d at 748; L.C. Page & Co. v. Fox Film

Corp., 83 F.2d 196 (2d Cir. 1936).

23

held that videocassette rights were encompassed by a broad

synchronization license to "exhibit, distribute, exploit, market,

and perform [a motion picture containing licensed musical compo-

sition] . . . perpetually throughout the world by any means or

methods now or hereafter known." Again, the court rested its

holding on the "extremely broad and completely unambiguous"

contractual grant of general rights to applications of future

technologies, which was held to "preclude[] any need in the

Agreement for an exhaustive list of specific potential uses of

the film." Id.

By contrast, in Cohen, 845 F.2d at 853-54, the Ninth

Circuit concluded that a 1969 contract granting rights to "[t]he

exhibition of [a] motion picture [containing a licensed work]

. . . by means of television," but containing a broad restriction

reserving to the licensor "all rights and uses in and to said

musical composition, except those herein granted," did not encom-

pass the right to revenues derived from sales of the film in

videocassette form. After deciding that "[t]he general tenor of

the [contract] section [in which the granting clause was found]

contemplate[d] some sort of broadcasting or centralized distribu-

tion, not distribution by sale or rental of individual copies to

the general public," see id. at 853 (emphasis added), the court

stressed that the playing of videocassettes, with their greater

viewer control and decentralized access on an individual basis,

did not constitute "exhibition" in the sense contemplated by the

contract.

24

Though videocassettes may be exhibited by
using a television monitor, it does not fol-
low that, for copyright purposes, playing
videocassettes constitutes "exhibition by
television." . . . Television requires an
intermediary network, station, or cable to
send the television signals into consumers'
homes. The menu of entertainment appearing
on television is controlled entirely by the
intermediary and, thus, the consumer's selec-
tion is limited to what is available on vari-
ous channels. Moreover, equipped merely with
a conventional television set, a consumer has
no means of capturing any part of the televi-
sion display; when the program is over it
vanishes, and the consumer is powerless to
replay it. Because they originate outside
the home, television signals are ephemeral
and beyond the viewer's grasp.

Videocassettes, of course, allow viewing of a
markedly different nature. . . . By their
very essence, . . . videocassettes liberate
viewers from the constraints otherwise in-
herent in television, and eliminate the in-
volvement of an intermediary, such as a net-
work.

Television and videocassette display thus
have very little in common besides the fact
that a conventional monitor of a television
set may be used both to receive television
signals and to exhibit a videocassette. It
is in light of this fact that Paramount ar-
gues that VCRs are equivalent to "exhibition
by means of television." Yet, even that
assertion is flawed. Playing a videocassette
on a VCR does not require a standard televi-
sion set capable of receiving television
signals by cable or by broadcast; it is only
necessary to have a monitor capable of dis-
playing the material on the magnetized tape.

Id. at 853-54.

Most recently, in Tele-Pac, Inc. v. Grainger, 570

N.Y.S.2d 521, appeal dismissed, 580 N.Y.S.2d 201, 588 N.E.2d 99

(1991), the court held (one judge dissenting) that a license to

25

distribute certain motion pictures "for broadcasting by televi-

sion or any other similar device now known or hereafter to be

made known" did not encompass the videocassette film rights.

"Transmission of sound and images from a point outside the home

for reception by the general public . . . is implicit in the

concept of 'broadcasting by television.' Conversely, while one

may speak of 'playing,' 'showing,' 'displaying,' or even perhaps

'exhibiting' a videotape, we are unaware of any usage of the term

'broadcasting' in that context." Id. at 523 (emphasis added).

c. Video Rights and the RRL.

Although the question is extremely close, under the

interpretive methodology outlined above we conclude that the

RRL's grant of rights to the 104 film episodes "for television

viewing" did not encompass the right to distribute the "Curious

George" films in videocassette form.

First, unlike the contracts in Rooney and Lucasfilm,

the RRL contained no general grant of rights in technologies yet

to be developed, and no explicit reference to "future methods" of

exhibition. Compare Lucasfilm, 566 F. Supp. at 227; Rooney, 538

F. Supp. at 228. Rather, the RRL appears to contemplate a

comparatively limited and particular grant of rights, encompass-

ing only the 104 film episodes and leaving future uses of "Curi-

ous George" to later negotiation in the ancillary products

agreement. Although the RRL conversely contains no "specific

limiting language," compare Cohen, 845 F.2d at 853, we believe

such limitation is reasonably inferable from the situation of the

26

parties and the "general tenor of the section" in which the

"television viewing" rights were granted.

Second, as properly noted in Cohen, "television view-

ing" and "videocassette viewing" are not coextensive terms. Even

though videocassettes may be, and often are, viewed by means of

VCRs on home television screens, see, e.g., Sony Corp. of America

v. Universal City Studios, Inc., 464 U.S. 417, 429 (1984) (noting

prevalent use of videocassette recorders for "time-shifting" of

commercial television programming); Rooney, 538 F. Supp. at 228

("whether the exhibition apparatus is a home videocassette player

or a television station's broadcast transmitter, the films are

'exhibited' as images on home television screens"), still, as the

Ninth Circuit pointed out, a "standard television set capable of

receiving television signals" is not strictly required for video-

cassette viewing. Cohen, 845 F.2d at 854. "[I]t is only neces-

sary to have a monitor capable of displaying the material on the

magnetized tape." Id. Indeed, a number of non-television

monitors recently marketed in the United States permit videocas-

sette viewing on computer screens, flat-panel displays, and the

like.8 Thus, we find insufficient reliable indicia of a con-

trary mutual intent on the part of Rey and LHP to warrant dis-

turbing the district court's implicit determination that the

8See, e.g., Nathalie Welch, ASK Flat-Panel Display Now

Available in U.S., MacWeek, January 4, 1993 (noting availability

of flat-panel LCD monitor capable of displaying VCR output);
Alice Laplante & Stuart Johnston, IBM Unveils Multimedia Adapter

Board, Software Toolkit, InfoWorld, February 12, 1990 (noting

availability of MCA adapter card permitting videocassette images
to be viewed and manipulated on PS/2 color computer monitor).

27

language of the RRL is not "broad enough to cover the new use."

Bartsch, 391 F.2d at 155.

Finally, any lingering concerns about the correctness

of the district court's interpretation are dispelled by the

evidence that the RRL (including its "television viewing" clause)

was drafted and proposed by LHP, a professional investment firm

accustomed to licensing agreements. Rey, an elderly woman, does

not appear to have participated in its drafting, and, indeed,

does not appear to have been represented by counsel during the

larger part of the transaction. Under these circumstances, as

noted supra pp. 21-22, ambiguities in the drafting instrument are

traditionally construed against the licensor and the drafter.

See also Nimmer at 10-71 ("ambiguities [in licensing agreements]

will generally be resolved against the party preparing the

instrument of transfer"); U.S. Naval Institute v. Charter Commu-

nications, Inc., 875 F.2d 1044, 1051 (2d Cir. 1989) (interpreting

ambiguous copyright assignment against sophisticated drafting

party); see generally, e.g., Merrimack Valley Nat'l Bank v.

Baird, 372 Mass. 721, 724, 363 N.E.2d 688, 690 (1977) ("as a

general rule, a writing is construed against the author of the

doubtful language . . . if the circumstances surrounding its use

and the ordinary meaning of the words do not indicate the intend-

ed meaning of the language").

Accordingly, as the Sony videocassette sales were not

encompassed by the RRL, but governed exclusively by the APA, we

find no conflict between the terms of the documents, and we

28

affirm the award of royalties to Rey under the APA.

B. The "Junk Products" Counterclaim.

We next turn to the LHP counterclaim that Rey breached

the APA by "wrongfully withholding" approval of ancillary prod-

ucts she considered "junky."9 The district court agreed with

LHP, holding that

[The Ancillary Products Agreement] clearly
contemplated the exploitation of Curious
George. . . . Based on the testimony of Ms.
Stoebenau and Mr. Konkle, I find that means
that there may be produced with the charac-
ter, junk products, junky products. . . .
Plaintiff [had] the right . . . to insist on
. . . an honest and good depiction of the

character. She did not have the right to

disapprove the quality of the product. . . .

She had [the] right to disapprove an incor-
rect, improper, bad depiction of Curious
George.

(Emphasis added.) The court further found:

[A]lthough Mrs. Rey unquestionably approved
many products, I find that she improperly
disapproved the Sears project for the reasons
just outlined; that she was unreasonable
with respect to the Eden project, and that
she was so rude to Ms. Craighead as to abort
the second and perhaps later trilogies of the
software.

(Emphasis added.) After careful consideration, we must agree

with Rey that the district court misapplied the APA.

The product-approval procedure under the APA required

9LHP does not challenge the district court ruling that its
counterclaims for interference with contractual and advantageous
business relationships, breach of the implied covenant of good
faith and fair dealing, and unfair business practices under
chapter 93A were time-barred.

29

that:

LHP will submit product or other information
sufficient to describe the product to you for
prior approval. When a product is submitted
. . . we will wait two weeks before proceed-
ing. If we do not receive any disapproval of
the product from you within two weeks we are
entitled to presume that you approve of the
product. If you do disapprove of any prod-
uct, you will, if feasible, suggest such
changes to LHP as may render the product
acceptable to you, or, if you cannot make
such feasible suggestions, you may refuse to
approve the product. Product approval will
not be unreasonably withheld.

The term "product" is not defined in the APA. It is black letter

law, however, that where "the words of an agreement are plain and

free from ambiguity, they must be construed in their ordinary and

usual sense," Boston Edison Corp. v. FERC, 856 F.2d 361, 365 (1st

Cir. 1988), and, as we have noted in another context, the word

'product,' taken in its ordinary and usual sense, "simply means

'something produced.'" See K Mart, 892 F.2d at 1085 (quoting

Webster's Third New International Dictionary 1810 (1981)). See

also id. at 1084 ("where possible, words should be given their

natural meaning, consistent with the tenor of contractual

terms"); id. at 1085 ("[I]t is sufficient [to avoid ambiguity] if

the language employed is such that a reasonable person, reading

the document as a whole and in realistic context, clearly points

toward a readily ascertainable meaning"). Considered in context,

we think the "ordinary and usual" meaning of the broad term

"product" plainly indicates the parties' mutual intention that

each article bearing the likeness of "Curious George" not

30

merely the likeness itself be approved by Rey.

By contrast, the narrow interpretation urged by LHP

would convert the term "product" into a mere synonym for the

"Curious George" mark. Nowhere does the APA intimate that the

parties contemplated that the term "product" was to be given so

restrictive an interpretation. Indeed, elsewhere the APA plainly

precludes the narrow interpretation urged by LHP by expressly

distinguishing between the mark and the "product" with which it

is used. See APA p.3 ("[LHP] will not sell or authorize the sale

or distribution of any product on or in connection with which

'Curious George' is used . . .") (emphasis added); id. at 3-4

(referring to separate approval procedure for "apparel prod-

ucts").10 As the APA is unambiguous in this regard, the trial

10The interpretation we adopt accords with the common-sense
understanding recognized in other areas of intellectual property
law. Thus, for example, in the trademark context, courts fre-
quently have recognized that "the trademark holder [has] the
right to control the quality of the goods manufactured and sold
under its trademark," Shell Oil Co. v. Commercial Petroleum,

Inc., 928 F.2d 104 (4th Cir. 1991) (emphasis added); El Greco

Leather Products Co. v. Shoe World, 806 F.2d 392, 395 (2d Cir.

1986), cert. denied, 484 U.S. 817 (1987)) ("The actual quality of

the goods is irrelevant; it is the control of quality that a

trademark holder is entitled to maintain") (emphasis added); see

also Societe des Produits Nestle, S.A. v. Casa Helvetia, Inc.,

982 F.2d 633 (1st Cir. 1992) (hereinafter Produits Nestle)

("[r]egardless of the offending goods' actual quality, courts
have issued Lanham Act injunctions solely because of the trade-
mark owner's inability to control the quality of the goods
bearing its name"). "The rationale for this requirement is that
marks are treated by purchasers as an indication that the trade-
mark owner is associated with the product." Kentucky Fried

Chicken Corp. v. Diversified Packaging Corp., 549 F.2d 368, 387

(5th Cir. 1977). Indeed, under trademark law the protection of
the mark may be lost if the licensor fails to control the quality

of the licensed goods; failure to control the quality of licensed
goods can constitute an abrogation of the licensor's duty to
protect the informational value of the mark. See Kentucky Fried

31

testimony of LHP's witnesses, Cheryl Stoebenau and Glen Konkle,

need not be considered. Extrinsic evidence may not be utilized

to contradict the unambiguous terms of a written agreement. See

LTX Corp., 926 F.2d at 1263-64; Triple-A Baseball Club Assoc. v.

Northeastern Baseball, Inc., 832 F.2d 214, 221 (1st Cir. 1987),

cert. denied, 485 U.S. 935 (1988).

Chicken, 549 F.2d at 387; see also Church of Scientology Int'l v.

Elmira Mission of Church of Scientology, 794 F.2d 38, 43 (2d Cir.

1986). LHP argues that the licensor's duty of control is less
stringent where the mark is licensed for use in a context unre-
lated to the licensor's original business. See Winnebago Indus.,

Inc. v. Oliver & Winston, Inc., 207 U.S.P.Q. 335, 340 (T.T.A.B.

1980). Whatever its merit as a general matter, however, this
proposition is unavailing in the present context: the APA
licensed the use of "Curious George" for purposes both related

and unrelated to the original (literary) use of the "Curious

George" mark, and in no instance does it distinguish between
"related" and "unrelated" uses.
Similarly, under copyright law, while a licensor has no
"moral right" to control the quality of licensed depictions, see

Gilliam v. American Broadcasting Cos., 538 F.2d 14, 24 (2d Cir.

1976), she may insist, contractually, on approval provisions to
"assure quality control and high standards in the exploitation"
of her creative work." See Clifford Ross Co. v. Nelvana, Ltd.,

710 F. Supp. 517, 520 (S.D.N.Y.), aff'd. without opinion, 883

F.2d 1022 (2d Cir. 1989); see also Zim v. Western Pub. Co., 573

F.2d 1318, 1324 (5th Cir. 1978) (author has "profound interest,
both professional and financial, in maintaining the quality of
[published products], particularly those already published under
[her] name"). Clifford Ross is particularly instructive, as it

too involved a "classic literary property," the "Babar" child-
ren's book character. Upholding a contractual provision which
called for the copyright holder's participation in the selection
of licensing agents for the character, and enjoining the issuance
of further licenses absent the holder's approval, the court
concluded that there would be "irreparable harm" to the future
profitability of "Babar," and to the artistic reputation of the
holder, "if the exploitation of Babar continue[d] without regard
to [the licensor's] high standards of quality control." Clifford

Ross, 710 F. Supp. at 520. Compare Geisel v. Poynter Products,

Inc., 283 F. Supp. 261 (S.D.N.Y. 1968) (issuing injunction under

Lanham Act; finding likelihood of "irreparable harm" to author's
reputation where "Dr. Seuss" toys, which author found to be
"tasteless, unattractive, and of an inferior quality," were
marketed as authorized by author).

32

Even though the APA's product approval clause did not

preclude Rey from rejecting products based on their "junky"

quality, it did obligate her to act "reasonably" in doing so.

The duty to act "reasonably," like a duty to employ "best ef-

forts," or to act in "good faith," is not reducible to "a fixed

formula[, and] varies with the facts and the field of law in-

volved." See Triple-A Baseball Club, 832 F.2d at 225 (discussing

contractual "best efforts" clause); see generally Robert S.

Summers, "Good Faith" in General Contract Law and the Sales

Provisions of the Uniform Commercial Code, 54 Va. L. Rev. 195,

201, 204-07 (1968) (discussing "good faith" as "phrase without

general meaning," incapable of precise definition). In a some-

what different context, the Massachusetts courts have interpreted

contractual clauses preventing the "unreasonable withholding of

approval" of commercial sublessees, as imposing a duty to act "in

accordance with usual standards of reasonableness." See Nassif

v. Boston & M. R. Co., 340 Mass. 557, 564, 165 N.E.2d 397, 401-02

(1966); Worcester-Tatnuck Square CVS, Inc. v. Kaplan, 33 Mass.

App. Ct. 499, 601 N.E.2d 485 (1992). It falls to us to define

"usual standards of reasonableness," in the present context, in a

way which accords with the contracting parties' intent, yet

avoids rendering the "reasonableness" standard either purely

illusory or duplicative of more particular contractual terms.

We think the APA's proscription of "unreasonable"

product disapproval required, at a minimum, that Rey articulate

some material reason, subjective or otherwise, for disapproving a

33

product. That is to say, Rey could not withhold product approval

without ascribing a reason, nor for reasons immaterial to the

"Curious George" mark, its proposed use or commercial potential,

or unrelated to Rey's artistic and reputational identification

with the mark and ancillary products. Moreover, assuming there

existed some material ground for withholding product approval, it

would need to be communicated, consistent with contractual speci-

fications, "within a reasonable time and in a reasonable manner,

i.e., in a manner which makes it possible for [the licensee] to

rework the [product] in order to meet . . . approval." See Zim,

573 F.2d at 1324. Finally, the reason for withholding product

approval could not be so preclusive as to frustrate the fundamen-

tal contractual assumptions on which the APA was formed. In the

context of this case, for example, Rey could not impose approval

standards which would effectively eliminate all potential for

profitable use of the "Curious George" property; the parties'

mutual assent, in the APA, that Rey would be entitled to minimum

royalty payments, plainly implied a mutual understanding that

some licensing of the "Curious George" character would be accept-

able, in order to enable sales from which royalties might be

generated. Cf. Steven J. Burton, Breach of Contract and the

Common Law Duty to Perform in Good Faith, 94 Harv. L. Rev. 369,

403 (1980) ("discretion in performance may be exercised legiti-

mately [only] for the purposes reasonably contemplated by the

parties").

The district court supportably found that Rey approved

34

"many products," including the original film series, the Houghton

Mifflin books, the Sony videocassettes, the first series of DLM

software, and the Eden plush toys (as modified). In addition,

Rey testified, without contradiction, that she had approved

"children's sweatshirts, film strips, earmuffs and school bags

for children . . . buttons, children's books . . . paper doll

books[,] [w]rist watch, alarm clocks, wall clocks, footwear,

little tennis shoes for children, . . . [b]each slippers, . . ."

After reviewing the record, we are convinced that Rey did not

utilize objectively unreasonable criteria for approving products

under the APA. We turn to the particular product rejections

challenged on appeal.

1. The Sears Pajamas.

The district court ruled that Rey acted unreasonably by

basing her disapproval of the Sears project on the "junky"

quality of the pajama material which would bear "Curious Georg-

e's" likeness.11 As we have stated, see supra at pp. 32-34,

the basis for the district court's finding of "unreasonableness"

was insufficient as a matter of law. Rey did not unreasonably

withhold approval of the Sears pajama project as unbefitting the

"Curious George" image protected by her copyright, because the

grounds for withholding approval were reasonably related to the

11The district court did not address the aesthetic reasons
Rey gave for rejecting the Sears project, viz., the "bright

yellow" color of the pajama material and the unrecognizable
"plump" depiction of "Curious George." We believe these grounds
were not unreasonable.

35

integrity and commercial value of her artistic creation. See

Clifford Ross, 710 F. Supp. at 520.12

2. The Beach Paper Products.

Our conclusion that Rey reasonably rejected the Sears

project disposes of LHP's claim for damages relating to the Beach

paper products as well. Rey never saw, much less "disapproved,"

the Beach paper products: as the undisputed evidence shows,

Beach withdrew its proposal when the Sears project fell through;

it never reached agreement with LHP or presented any product to

Rey for approval. Therefore, LHP's claimed right to recover

potential profits from the Beach project could be justified, if

at all, only as consequential damages resulting from a wrongful

rejection of the Sears project. As the Sears project was not

wrongfully rejected under the terms of the APA, LHP is not

entitled to consequential damages related to Beach's anticipated

12LHP nonetheless maintains that Rey's rejection of the
Sears pajama project was "unreasonable," insofar as it was not
communicated in a manner which "ma[de] it possible . . . to
rework the [product] in order to obtain . . . approval." Zim,

573 F.2d at 1324. LHP argues that time pressures inherent in the
Sears catalog deadlines made the presentation of the pajamas a
"one-shot deal," with "reworking" of the design impossible once
rejection had occurred. It insists that the "lousy material" in
the pajamas a basis for Rey's disapproval was required by
federal fire safety standards; no other material was available
for use in the product.
Even assuming these fact-based arguments are well founded,
however an assessment we are in no position to make on the
present record they are beside the point: the APA's "reason-
ableness" constraint did not oblige Rey to apply lower standards,
or to relax her vigilance in policing ancillary uses for the
"Curious George" character, merely because deadlines were tight
or objections to the product could not be cured. See APA at p. 3

("if you disapprove of any product, you will, if feasible,

suggest such changes to [LHP] as may render the product accept-
able to you") (emphasis added).

36

profits. See, e.g., Ryan v. Royal Ins. Co., 916 F.2d 731, 744

(1st Cir. 1990) ("unless appellants can demonstrate that [appel-

lee] breached a duty owed to them. . . . consequential damages

will not lie").

3. The Eden Plush Toys.

The district court ruled that Rey acted unreasonably

with respect to the Eden plush toys project, but the court did

not state whether its ruling was based on Rey's objections to the

"junky" nature of the proposed product, or some other ground. We

conclude, nonetheless, that remand is unnecessary in the present

circumstances, see Produits Nestle, 982 F.2d at 640-41 ("when a

trial court misperceives and misapplies the law, remand may or

may not be essential"), since LHP did not present sufficient

evidence to enable a finding that Rey's actions with respect to

Eden were "unreasonable." See id. at 642 (quoting Dedham Water

Co. v. Cumberland Farms Dairy, Inc., 972 F.2d 453, 463 (1st Cir.

1992)). Applying the standard articulated supra pp. 33-34,

"reasonableness" in the present context turns, first, on whether

the reasons for rejecting a proposed product were "material." As

recently noted by the court, "[t]here is no mechanical way to

determine the point at which a difference becomes 'material.'

Separating wheat from chaff must be done on a case-by-case

basis." Produits Nestle, 982 F.2d at 641. In reference to

conventional commercial products, such as the Perugina chocolates

licensed in Produits Nestle, the appropriate test is whether the

ground for refusing to approve a version of a licensed product is

37

one which "consumers would likely consider relevant." Id. In

the context of an artistic creation such as "Curious George,"

however, the highly subjective element of "creativity," connect-

ing product and author, implicates intangible considerations such

as the "total concept and feel" of the product. See Roth Greet-

ing Cards v. United Card Co., 429 F.2d 1106 (9th Cir. 1970); see

also Sid & Marty Krofft Television Productions, Inc. v. McDonalds

Corp., 562 F.2d 1157 (9th Cir. 1977). We believe an author's

discretionary right to disapprove an ancillary product, as not in

keeping with the aesthetic image the author envisions for her

artistic creation, reasonably may be made to depend on product

conformity, at least where, as here, conformity with the author's

aesthetic standard would neither set unreasonably high levels of

commercial practicality nor foreclose all prospect of profit-

ability on which the contract was predicated. See supra at pp.

33-34.

The evidence before the district court clearly showed

that Rey imposed a demanding aesthetic standard for the design of

the Eden Toys doll.13 Eden's frustration at Rey's meticulous

immersion in the details of toy design may indeed be understand-

able, the more so perhaps because of the irascible terms in which

Rey appears to have chosen to couch her product criticisms on

occasion. Even viewing the evidence as a whole in the light most

13For example, she relocated the felt patterns on "Curious
George's" face by a few millimeters and rejected particular
colors and color combinations which Eden thought would make the
doll more saleable.

38

flattering to LHP, however, we cannot conclude that her proposed

changes were unrelated to her legitimate artistic concerns or to

her desire to protect the aesthetic integrity of the "Curious

George" image.

"Reasonableness" likewise requires, of course, that

changes be made "within a reasonable time and in a reasonable

manner, i.e., in a manner which makes it possible for [the licen-

see] to rework the [product] in order to meet . . . approval."

See Zim, 573 F.2d at 1324. The evidence before the district

court, which we have examined in detail, did not show that Rey's

product criticisms, though caustic, were made in an unreasonable

time or manner. And although the record is replete with testimo-

ny that Eden and LHP grumbled about Rey's product criticisms,

neither Eden nor LHP ever communicated to Rey, prior to the

present lawsuit, that her proposed changes to the Eden plush toy

products were impracticable or even unduly burdensome.14 Since

Rey's objections to Eden's original toy design were based on

criteria reasonably related to her legitimate artistic and

aesthetic concerns about the proposed ancillary product, and were

communicated in a time and manner which would permit Eden to

conform the product, we conclude that Rey's rejection of Eden's

product designs was not "unreasonable."

14For example, the President of Eden Toys testified:
"[W]hat we tried to do, therefore, was to get very specific, and
say: If you want it moved three millimeters to the left, we'll

move it, but let's all agree on that's where it's going to be . .

. ." (Emphasis added.)

39

4. The DLM Software.

Finally, we consider whether Rey's alleged rudeness to

Donna Craighead, the DLM project manager, amounted to an "unrea-

sonable withholding of approval" of the DLM software project in

violation of the APA. We conclude that it did not. As all

parties agree, the licensing arrangement between DLM and LHP

covered only the first installment in the proposed DLM software

trilogy, the first installment was approved by Rey prior to her

telephone conversation with Craighead, and DLM continued to

manufacture and market the first-installment software even after

Rey's intemperate remarks. Given the fact that Rey's statements

led to no curtailment in the production or sale of the licensed

software, we are unable to discern any relevant respect in which

Rey's statements to Craighead could be considered a "rejection"

of the product for which LHP had issued its license to DLM.

The district court apparently thought that Rey's harsh

criticism of the first software installment may have discouraged

DLM from undertaking "second and . . . later" installments in the

proposed trilogy. Here, however, the relevant consideration is

that these subsequent installments had not yet been licensed by

the time Rey communicated her criticism about the first software

product and manual. Even were Rey's criticism actionable in

tort, as an "intentional interference with contractual rela-

tions," see Restatement (Second) of Torts 766, or as a breach

of the implied good-faith duty not to interfere with LHP's per-

formance under the APA, it nevertheless was not actionable in

40

contract. Under the plain terms of the APA, Rey could not

"reject" products not yet licensed or presented for approval.15

LHP attempts to extend the APA's plain language by

characterizing Rey's criticism of the DLM project as "essentially

revok[ing] product approval [of] the DLM software concept"

already approved by Rey. LHP does not define the term "software

concept," but clearly uses it to encompass not only the first DLM

product but all subsequent installments in the planned trilogy.

Such an interpretation would not withstand analysis under the

language of the APA, however, nor comport with the undisputed

record evidence.

We reject LHP's overly expansive definition of "prod-

uct" in the present context. By lumping all DLM software prod-

ucts under the umbrella of a single software "concept," LHP would

eviscerate Rey's retained right to grant, or reasonably withhold,

approval for distinct generations of software products in a

particular software series. All conceptually related articles

identified by LHP as part of the same series would be deemed

approved, sight unseen; the policing of the integrity of the

conceptual relationship presumably having ceased to be a matter

of legitimate concern to Rey. Courts universally recognize that

the elasticity of contract language is limited by the natural

meaning of its terms and their context. See K Mart, 892 F.2d at

15The district court ruled that the tort claims arising out
of "most of" Rey's conduct were time-barred. LHP does not
challenge this ruling. See supra n.9 and accompanying text.

41

1085; Boston Edison Corp., 856 F.2d at 365. LHP's interpretation

strips the "product approval" term from its context and depletes

its natural meaning.

CONCLUSION

Under the APA, Rey is entitled to recover the royalties

wrongly withheld on the Houghton Mifflin books and Sony videos;

and we affirm the district court rulings respecting these claims.

The APA likewise entitled Rey to withhold approval of licensed

ancillary products on reasonable grounds; thus, LHP was not

entitled to recover damages for Rey's reasonable exercise of her

right to withhold approval of the Sears pajama project, the Beach

paper products, the Eden Toys project, or the DLM software.16

Accordingly, the damages awards to LHP are vacated.

Affirmed in part, reversed in part; costs are awarded

to Rey.

16We have considered all other arguments advanced by the
parties and find them either to be wanting or, alternatively,
moot. Without limiting the generality of the foregoing, we note
that, because we conclude that Rey reasonably withheld approval
of the Sears project, the Eden plush toys, and the DLM software,
we need not consider whether LHP's estimates of lost future
profits from these products were sufficiently certain and non-
speculative to support an award of damages. See, e.g., Hendricks

& Assocs., Inc. v. Daewoo Corp., 923 F.2d 209, 217 (1st Cir.

1991) (citing John Hetherington & Sons, 210 Mass. 8, 21, 95 N.E.

961 (1911)); Redgrave v. Boston Symphony Orchestra, Inc., 855

F.2d 888, 893 (1st Cir.), cert. denied, 488 U.S. 1043 (1988).

Nor need we consider whether the damages awarded LHP for these
products should have been reduced by 50%, reflecting Rey's share

of product royalties under the pre-1988 APA formula, or by 33%,
under the revised APA formula for products licensed after January
1, 1988.

42